George G. LYNCH and Marian T. Lynch, Petitioners-on-Review,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-on-Review.

Leslie JULIAN and Pearl A. Julian, Petitioners-on-Review,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-on-Review.

Nos. 148, 149, Docket 25821, 25822.

United States Court of Appeals
Second Circuit.
Argued Nov. 19, 1959.
Decided Dec. 17, 1959.

Leland T. Atherton, Hartford, Conn. (Henry L. Shepherd, Hartford, Conn., and Shepherd, Murtha & Merritt, Hartford, Conn., on the brief), for petitioners-on-review.

Grant W. Wiprud, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and J. Dwight Evans, Jr., Washington, D. C., on the brief), for respondent-on-review.

Before MEDINA, MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

These are petitions to review two decisions of the Tax Court, 31 T.C. 990 and 998, adverse to the taxpayers. Both cases arise out of a plan for reducing income taxes by deductions for the alleged payment of interest on loans to finance

the purchase of Government bonds, which was devised by M. Eli Livingstone. Decisions favorable to the government in cases at least broadly similar have been rendered by the Court of Appeals for the First Circuit in Goodstein v. Commissioner, 1958, 267 F.2d 127 and Sonnabend v. Commissioner, 1 Cir., 1958, 267 F.2d 319, affirming respectively 30 T.C. 1178 and 1958 P-H T. C. Memorandum Decisions, par. 58,178, and by the Court of Claims in Broome v. United States, 1959, 170 F.Supp. 613. Taxpayers contend that these cases were wrongly decided and also that an important distinction of fact exists. In addition they advance an alternative contention that does not appear to have been raised in Broome, namely that even if their claims for interest deductions under § 23(b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(b) (Int.Rev.Code of 1954, § 163(a), 26 U.S.C.A. § 163(a)) should be held to have been properly denied, the same amounts ought to have been allowed as deductions under § 23(a)(2) as "ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income." Although we have come to the same conclusion as the Tax Court, the First Circuit and the Court of Claims, we shall state our views, in response to taxpayers' request that we do so and also because other variations on the Livingstone theme may arise in this Circuit.

Taxpayers were co-owners and principal executives of the Bristol Machine Tool Company in Bristol, Connecticut. Lynch's function was "to run the shop completely, including sales and everything else that goes with it." Julian did "engineering, office work, taxes and so forth." In 1953 Lynch received salary and dividends from the Company totaling $134,435.32 and had other income of $2,240.04; Julian received salary and dividends of $134,867.32 and had other income of $4,737.90.

M. Eli Livingstone was a security dealer in Boston doing business under the name of Livingstone & Company. He developed a plan that offered high income taxpayers the enticing prospect of reducing or indeed almost eliminating income taxes, at relatively modest cost to themselves and at a pleasant profit to Livingstone. An essential part of this plan was the making of loans from various so-called finance companies. Gail Finance Corporation was one of these. It was organized on October 30, 1953 with a total capital contribution of $1,000. It and five similar companies had their quarters in the Boston law office of Harry N. Cushing, a longtime friend and former law partner of Livingstone. Cushing was president or treasurer of all of them. None had telephone or address listings.

Julian testified that in 1953 he was discussing the possibility of a pension plan for his Company with his lawyer, Judge Frederick W. Beach, of Bristol, who recommended consulting Gustave Simons, an attorney and business consultant of New York City. Discussions with Simons, Beach and taxpayers' accountant, Howard L. Page, led to the series of actions hereinafter described:

(1) On or about December 2, 1953, Livingstone & Company loaned each taxpayer $80,000. The loans were unsecured and non-interest-bearing. The Tax Court found the loan to Julian was not evidenced by any written document, and we see nothing to indicate there was any written document to evidence the loan to Lynch.

(2) On December 3 Livingstone sent each taxpayer confirmations of the sale to the taxpayer at 86⅞ of $650,000 face value United States Treasury 2¾% Notes due September 15, 1961 with March 15, 1959, and subsequent coupons attached.[1] The purchase price in each case was $564,687.50. Livingstone charged no commission on the sale.

(3) On the same day, December 3, each taxpayer executed a non-recourse promissory note to Gail for $653,250, payable September 15, 1958, secured by the

---

1. The closing market price for the Notes with all coupons attached was 101⅚₂.

Treasury Notes described in item (2). The promissory note recited that interest in the amount of $117,677.11 had been prepaid. The maker had the right to anticipate payment in whole or in part; in that event he was to receive back a prorated portion of the collateral but was to be charged interest at the rate of 1% prorated against the amount paid by anticipation.

(4) On the same date, December 3, each taxpayer drew a check to Gail for $117,677.11. The funds for this were provided by the $80,000 loan from Livingstone, item (1), and, at least in Lynch's case, by a $40,000 loan from his Company.

(5) On the same date, December 3, each taxpayer instructed Livingstone & Company to deliver the Treasury Notes to Gail against payment of $653,250, the stated proceeds of taxpayer's "loan" from Gail, to reimburse itself in the amount of $564,687.50 and to remit the difference, $88,562.50, to taxpayer.

(6) When Gail purported to "loan" each taxpayer $653,250 it had only $1,-381.65 cash on hand. It purportedly raised most of the funds required for the "loans" by selling short, to or through Livingstone & Company, the identical type and amount of Treasury Notes petitioners had purchased from Livingstone and pledged with Gail, for the same price, $564,687.50, that petitioners had agreed to pay.[2] In fact, no Treasury Notes were ever delivered by Livingstone to Gail for petitioners' account. Neither were any amounts ever paid by Livingstone to Gail on Gail's "short sale" of Treasury Notes or by Gail to Livingstone to cover petitioners' purchase. This was because Livingstone owed Gail $564,687.50 on the "short sale" whereas Gail was bound to pay Livingstone the same amount out of the "loans" made by Gail to petitioners. Similarly, Gail was bound at

some time to deliver Treasury Notes to Livingstone to cover the "short sale" whereas Livingstone was obligated to deliver to Gail the same amount of Treasury Notes allegedly sold to petitioners. The various liabilities thus cancelled each other.

(7) On or about December 7, Gail sent each taxpayer a check for $88,562.50. See item (5).

(8) On or about December 10, each taxpayer repaid Livingstone the $80,000 referred to in item (1).

When the week's work was completed, what was left was this: Each taxpayer was out of pocket in the sum of $29,-114.61, the excess of the alleged prepayment of $117,677.11 "interest," item (4), over the repayment of $88,562.50 by which the "loan" exceeded the purchase price of the Notes, item (7). Each taxpayer had a contractual right to require Gail to deliver the $650,000 of Treasury Notes described in item (2) against payment of $653,250, with a further right to anticipate payment on the terms stated in item (3). In other words taxpayers for their payment of $29,114.61 [3] had obtained a call on Gail for these Notes. What they also thought they had were deductions for prepaid interest which reduced Lynch's income tax liability from $83,947.48 to $4,066.16 and Julian's from $83,132.46 to $3,605.94. Whether they in fact obtained these deductions is the issue here.

The government urges that the interest deductions are forbidden by Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, which the government construes as establishing a doctrine forbidding generally the recognition for tax purposes of transactions entered into for the sole purpose of tax avoidance. The taxpayers counter with a contention that the principle of Gregory v. Helvering does not apply to the deduction of inter-

---

2. More than enough for the balance of $88,562.50 was provided by petitioners' payment of $117,677.11 as "prepaid interest."

3. Apparently not much of the "interest" remained with Gail. For, although Gail

had "loaned" millions of dollars, it reported a taxable net income of only $1,-487.73 for its fiscal year ending October 31, 1954. Large commissions and "finders·fees" were paid to Livingstone.

est under § 23(a) (2) of the 1939 Code, since § 23(a) (2) permits the deduction of interest paid or incurred for personal as well as for business purposes. And while they concede that tax avoidance was an important motive for the transactions, they deny it was the sole one and claim they were also interested in the possibility of appreciation in the Treasury Notes.

Taxpayers' contentions meet serious obstacles. We said in C. I. R. v. Transport Trading & Terminal Corp., 2 Cir., 1949, 176 F.2d 570, 572, certiorari denied 1950, 338 U.S. 955, 70 S.Ct. 493, 94 L.Ed. 589 that the doctrine of Gregory v. Helvering is not limited to cases of corporate reorganizations. Of course any application of the doctrine of Gregory v. Helvering to § 23(b) would have to recognize that the interest deduction extends to personal as well as to business transactions; but the government argues that this would still require that some purpose other than tax avoidance be shown. Here there was much evidence to cast doubt on petitioners' claim of such a purpose. As the Tax Court pointed out, these Treasury Notes (with coupons prior to March 15, 1959 detached) were purchased at 86⅞ and would have to rise to 105, an appreciation of more than 20% over the purchase price, before taxpayers would recoup their "prepaid interest" of $117,-671.11. Yet the price at which peti-

tioners purchased the Notes was exceedingly high, reflecting the very low interest rates prevailing at the end of 1953. On the maturity of the promissory note on September 15, 1958, the Treasury Notes would themselves mature in three years. Of course their market price could be expected gradually to rise above the 86⅞ that was paid for them with the interest coupons from March 15, 1954 through September 15, 1958 "detached," but the prospect of a large premium on a 2¾% note with only three years to run was dim, indeed.[4] Yet exercise of the right of prepayment would involve a sacrifice of petitioners' highly prized "interest" deduction.[5]

■■ However, we are not required to and do not rest our decision here on the principle of Gregory v. Helvering. Decision here can be placed on the more fundamental ground that all the elaborate drawing of checks, execution of notes and bookkeeping entries performed by taxpayers, Livingstone and Gail, did not in fact produce the legal transactions which they simulated. The deduction permitted by § 23(b) of the 1939 Code for "all interest paid or accrued * * * on indebtedness" is for the payment of "compensation for the use or forbearance of money," Deputy v. DuPont, 1940, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416. Here no money was used or for-

4. In fact, the high market price of the Notes on September 15, 1958, was 98 ⁸/₃₂.

5. Taxpayers seek to support their contention that they were motivated by a desire to profit from appreciation in government bonds by the fact that in June 1954 they exercised their right to anticipate payment of the loan in respect of $50,000 of the Treasury Notes, which they sold, thereby realizing a net pre-tax profit of $1,710.82. However, the government points out that, after taking account of the effect of the "interest" refund on income taxes, Lynch would have suffered a loss of $4,378.12 and Julian of $4,192.90 on this sale. The transaction is thus hard to explain on business grounds consistently with taxpayers' thesis as to the validity of the interest deductions. It may not be wholly with-

out significance that this transaction came a few months after the government had promulgated Revenue Ruling 54–94, 1954–1 Cum.Bull. 53. This stated that "The attention of the Internal Revenue Service has been called to several situations where taxpayers are attempting to derive supposed tax benefits in connection with transactions designed to obtain interest deductions, for Federal income tax purposes," one of which was the Livingstone plan. It announced "the view of the Internal Revenue Service that amounts paid by taxpayer and designated as 'interest' in the above examples are not interest within the meaning of Section 23(b) of the Code, and are not deductible for Federal income tax purposes" since "the amounts paid by the taxpayer are not in substance payments for the use of borrowed money."

borne. When the series of transactions of December 3 to 10 was completed, the parties were exactly where they had been at the outset, save only that each taxpayer had paid $29,114.61 for a contractual right to delivery of the Treasury Notes. Johnson v. C. I. R., 2 Cir., 1936, 86 F.2d 710, presented a situation where $400,000 left the taxpayer's pocket on July 3 and was back on July 8, with an equally complicated set of steps taken in the interval. Holding that "everything was done at the same time and as part of one transaction," the Court looked at the end result rather than at an intermediate stage having no practical significance. We do so here. See Griffiths v. C. I. R., 1939, 308 U.S. 355, 358, 60 S.Ct. 277, 84 L.Ed. 319.

■ We find no force in taxpayers' attempt to avoid the teaching of those cases on the basis that taxpayers did not know of the round-robin nature of the transaction and believed they were incurring a debt to Gail. Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers. Beyond this, it would strain credulity to the breaking point to suppose that taxpayers had no inkling that something highly unusual was going on. While Lynch testified that he was innocent of financial matters and that he relied on his associate, Julian was experienced in such affairs. Both taxpayers had the advice of Simons, who brought the plan to their attention, of Beach, their own lawyer, and of Page, their accountant. Julian had several meetings with these men and with Livingstone. The transaction departed from the norm in numerous respects. It began with an $80,000 loan, unsecured, bearing no interest and apparently unevidenced, from Livingstone, with whom taxpayers had no acquaintance prior to the negotiation of the transaction here in question. Then came the purported sale of the Treasury Notes on which Livingstone charged no commission. Next came the making of a non-recourse loan by Gail

for $88,562.50 more than the then market value of the collateral. To be sure, more than enough for the excess was provided by the borrowers' own "prepayment" of "interest"; but this in itself was unusual. Gail was the lender to whom taxpayers looked for delivery of Treasury Notes when and if their professed motive to profit from appreciation in the government bond market should lead them to make a sale. Yet taxpayers never met Cushing, the *alter ego* of Gail, until their hearing before the Tax Court. Whether they made no investigation of Gail and its resources or were content with what they found, the inference is equally damaging. Taxpayers cannot therefore be insulated from the efforts of Livingstone and Cushing to "attempt to surround lifeless transactions with an aura of vitality." 31 T.C. at page 998.

Taxpayers seek to distinguish the decisions of the First Circuit and the Court of Claims cited above on the ground that there the taxpayers received back the amount of their interest payments and that in consequence the taxpayers, who were on a cash basis, could not claim a deduction for interest not actually paid during the taxable year. However the First Circuit's decision in Goodstein rested not only on the ground stressed by taxpayers but also on the ground, 267 F.2d at page 131, that "there was never in substance either a purchase of the notes by the taxpayer or borrowing of the purchase funds"; and the Commissioner of the Court of Claims found in Broome, 170 F.Supp. at page 614, that the remittances "did not rest upon any obligation" and therefore were not deductible as interest payments before he referred to the lender's repayments of the interest installments.

■ Taxpayers contend in the alternative that if their payments were not allowable as deductions for interest under § 23(b), they should have been allowed under § 23(a)(2) [Int.Rev.Code of 1954, § 212(1)] as "ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income." *On no view could*

this apply to more than the $29,114.61 that taxpayers actually expended. The government claims that taxpayers are precluded from advancing this contention since it was not made in the Tax Court; taxpayers respond that the issue was implicit in the case and therefore may be raised before us. We do not find ourselves required to resolve this dispute. For, even passing the question whether anything of the sort done here could be deemed "ordinary and necessary," the amounts by which taxpayers were out of pocket were not "expenses paid or incurred during the taxable year for the production or collection of income." We agree with the First Circuit's statement in Goodstein, 267 F.2d at page 132, that the expenditure "must be classified as an item of cost to be considered in the taxable year when the transaction was finally completed," that is, when the call either is exercised or expires.

Judgments affirmed.