KAPEL GOLDSTEIN AND TILLIE GOLDSTEIN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 94448.    Filed May 28, 1965.

*I. Meyer Pincus*, for the petitioners.

*John E. McDermott, Jr.*, and *Donald H. Cuozzo*, for the respondent.

PIERCE, *Judge:* On October 20, 1964, this Court filed in this case Memorandum Findings of Fact and Opinion, and also entered a decision in accordance therewith.

Thereafter on November 19, 1964, the petitioners filed herein motions for reconsideration of said Memorandum Findings of Fact and Opinion, and also for revision of said decision. The Court, upon consideration thereof, entered an order herein on November 23, 1964, wherein it was ordered: (1) That the said decision entered in this case on October 20, 1964, be, and the same was, withdrawn and vacated; (2) that petitioners' motion for reconsideration of the Memorandum Findings of Fact and Opinion issued under date of October 20, 1964, be, and the same was granted; and (3) that said Memorandum Findings of Fact and Opinion be, and the same was, withdrawn for reconsideration of the case.

The following are now the Findings of Fact and Opinion of the Court in this case.

---

The Commissioner determined a deficiency in the income tax of the petitioners for their taxable calendar year 1958, in the amount of $55,193.34.

The sole issue for decision is whether the sums of $52,596.61 and $28,800 (totaling $81,396.61), which petitioner Tillie Goldstein paid to certain lending institutions on December 31, 1958, and which she claims to be deductible for income tax purposes entirely in that year, as "prepaid interest" on two newly created items of "indebtedness" in the respective amounts of $465,000 and $480,000 (totaling $945,000), actually did, in substance and reality, constitute payments of "interest * * * on indebtedness" within the intendment of section 163(a) of the Internal Revenue Code of 1954.

#### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and all exhibits identified therein are incorporated herein by reference; subject however to an understanding that descriptive words used therein, such as "promissory note," "interest," "sales," and "loans," are not conclusive as to the true character of the transactions to which they relate, or as to the actual existence of an "indebtedness" within the meaning of the applicable statute.

### General Background Facts

The petitioners, Kapel Goldstein and Tillie Goldstein, are husband and wife who, during the taxable year here involved, resided in

Brooklyn, N.Y. For said taxable year, they filed a joint Federal income tax return, on the cash receipts and disbursements basis, with the district director of internal revenue at Brooklyn. The issue presented concerns only the wife, Tillie Goldstein, whom we will hereafter refer to as Tillie.

During the taxable year 1958, Tillie was a housewife; she was approximately 70 years of age. Her husband, Kapel, with whom she lived, was a retired garmentworker who received a pension of $780 per year. The couple's only income for the taxable year, exclusive of the proceeds from a winning Irish Sweepstakes ticket hereinafter mentioned, consisted of said $780 pension of the husband plus interest income of $124.45 from savings bank accounts. Also as of December 1, 1958 (which was prior to the receipt of said sweepstakes winning), the total assets of said couple consisted of the following:

| | |
|---|---:|
| Two accounts at Dry Dock Savings Bank | $2,050 |
| Account at First National City Bank | 360 |
| Note receivable from Lou Katz | 6,000 |
| Loan receivable from Sidney Handsman | 3,000 |
| Funds on deposit, New York Life Insurance Co. (matured endowment policy) | 1,000 |
| U.S. Government Series E bonds | 1,000 |
| Cash surrender value of life insurance policies (estimated) | 2,500 |
| Total assets | 15,910 |

The record does not disclose the amount of their liabilities, if any; nor does it disclose what portion, if any, of the above assets belonged to Tillie.

During the latter part of said year 1958, fortune smiled broadly on Tillie, for she learned that a ticket which she held on the Irish Sweepstakes was a winner; and that she would soon receive therefrom the sum of $140,218.75. Thereafter in December of said year, she did receive this amount. She deposited the same in a New York bank; and thereafter she included the same in gross income, in the abovementioned income tax return which she and her husband filed for the year 1958.

Tillie and her husband were the parents of a son, Bernard Goldstein, who in 1958 was a certified public accountant practicing in New York City. Beginning in November 1958, Bernard began a series of consultations with the attorney representing petitioners in the instant case—at least one phase of which consultations was the tax consequences to Tillie of her sweepstakes winnings. The question of using the provisions of the Internal Revenue Code allowing deductions for interest paid on indebtedness, came up. Bernard wanted to use that section (sec. 163, I.R.C. 1954), to save his mother taxes.

As a result of the foregoing discussions with the attorney, Bernard formulated and carried out a plan involving the use of the interest

expense deduction provisions of the 1954 Code, which he calculated would result in total Federal income taxes of $23,014.04 on his mother's sweepstakes winnings, as opposed to the tax of about $69,600 on such winnings which was determined in the deficiency notice herein after disallowance of the claimed deduction for interest. Bernard's plan envisioned, in substance, the "purchase" by his mother Tillie of $1 million face amount of U.S. Treasury 1½-percent notes, with "borrowed" funds on which she would prepay 4-percent "interest" for 1½ to 2½ years in the approximate amount of $80,000; and then the deduction by Tillie of such interest in its entirety, on the same 1958 income tax return on which her sweepstakes winnings of approximately $140,000 would be reported as income. The plan which was thereafter carried out, actually involved two separate transactions for the purported purchase of U.S. Treasury notes: One involving Treasury 1½-percent notes, maturing on October 1, 1962; and the other involving Treasury 1½-percent notes, maturing on October 1, 1961. The facts regarding these two transactions are as follows.

### Facts re Transactions Involving Treasury 1½-Percent Notes Maturing October 1, 1962

In late December 1958, Bernard acting on behalf of his mother Tillie, had consultations with the New York investment firm of Garvin, Bantel & Co. (hereinafter called Garvin-Bantel) regarding the tax-saving plan which he and said attorney had formulated. Garvin-Bantel was a member of both the New York and American Stock Exchanges, and it also engaged in the business of acting as a money broker. In this latter capacity its function was to arrange loans on behalf of third parties with various banks with which it had working arrangements, in consideration for commissions paid to it by such banks.

Thereafter on December 29, 1958, one of Garvin-Bantel's officers or employees, acting pursuant to said consultations with Bernard, contacted the First National Bank of Jersey City (hereinafter called the Jersey City bank), and arranged for said bank to make a "loan" to Tillie in the amount of $465,000; which loan would be evidenced by a personal promissory note of Tillie, maturing on October 15, 1961; on which loan Tillie would prepay "interest" at 4 percent per annum; and which loan would be "secured" by $500,000 face amount of Treasury 1½s due October 1, 1961, which were to be ordered for the Jersey City bank by Garvin-Bantel. The Jersey City bank agreed to this arrangement for the "loan," without any of its officers or employees seeing or talking either to Tillie or to Bernard, and also without them making any investigation of the credit or financial standing of Tillie or of her husband, Kapel. Indeed, the bank's records erroneously

listed the occupation of Kapel as a "Retired Gormet," when in fact he was a retired garmentworker.

On the next day, December 30, 1958, one of Garvin-Bantel's officers or employees called Malon S. Andrus, Inc. (hereinafter called Andrus), a dealer in Government securities, and arranged for Andrus to sell to the Jersey City bank $500,000 face amount of Treasury 1½s, due October 1, 1962, at 92.30,[1] (or $464,687.50) plus accrued interest of $1,875. Andrus paid a commission to Garvin-Bantel of $\frac{1}{32}$ on said notes (or $156.60) in respect to this transaction—all of which commission was retained by Garvin-Bantel and not credited to Tillie. Andrus' records indicated that the transaction was a sale by it to the Jersey City bank as a principal, there being no indication therein that the securities were purchased for the account of any customer of the bank. Andrus had no record or knowledge concerning Tillie Goldstein.

On the following day of December 31, 1958, Andrus' representative delivered to the Jersey City bank as principal, said $500,000 face amount of the 1962 Treasury 1½s, against payment by the bank of $464,687.50, plus $1,875 accrued interest. Tillie did not provide or pay either to Andrus, to Garvin-Bantel, or to the Jersey City bank, any of her personal funds or other assets toward the price of the principal amount of said securities.

Prior to December 31, 1958, Garvin-Bantel prepared for Tillie's signature: (1) A promissory note made payable to the Jersey City bank in the amount of $465,000; and (2) a letter of instructions to the Jersey City bank, wherein that bank was requested to receive the $500,000 face amount of 1962 Treasury 1½s as collateral on the loan which Tillie was about to make. After Tillie had signed both of these instruments, Garvin-Bantel transmitted them to the Jersey City bank, together with two checks of Tillie's: One for $52,596.61, purportedly to represent "interest" prepaid on the "loan" to October 15, 1961; and the other representing interest which had accrued on the Treasury 1½s prior to the time of their purchase. The said promissory note which Tillie executed was undated; and it bore the following typewritten statement on the face thereof: "Either party has the right to accelerate the maturity of this note after 30 days." Garvin-Bantel delivered all of these instruments to said bank on December 30 or 31, 1958.

The Jersey City bank, upon its receipt of the above-mentioned undated promissory note of Tillie's, stamped thereon the date of December

---

[1] The 1961 Treasury 1½s, which originally had been intended to be purchased, were not available; and therefore arrangements were made to substitute Treasury 1½s due Oct. 1, 1962, but to leave the maturity date of the "loan" at Oct. 15, 1961.

In the above figure of 92.30, the digits following the decimal point represent 32d's of a whole dollar rather than 100th's. Whenever prices of Treasury bonds and notes are hereinafter mentioned, the fractional part of a quoted price will be in terms of 32d's, viz, 99.24 will mean 99–24/32 rather than 99–24/100.

31, 1958; and it then entered the transaction on its books of account as a loan to Tillie. No officer of the Jersey City bank ever talked to Tillie, ever saw Tillie, or witnessed Tillie's signing of the promissory note.

The bank's records showed that the above promissory note was to bear interest at 3⅞ percent (as distinguished from the 4-percent rate stated on the face of the note itself); and that the bank paid the remaining ⅛ percent (or $1,643.66) to Garvin-Bantel as a commission for arranging the "loan." There is no evidence herein that Tillie paid any of said commission to Garvin-Bantel; and her 1958 Federal income tax return makes no reference to payment of any such commission. The promissory note, in addition to being secured by the Treasury 1½s, was also in effect secured by the unearned portion of the "prepaid interest" which Tillie had deposited with the bank in the manner above described.

Approximately 3½ months after the foregoing steps of this transaction had been completed, the Jersey City bank decided to terminate the transaction; and in this connection, it wrote Garvin-Bantel a letter dated April 22, 1959, which read as follows:

Gentlemen:

At present, the subject [Tillie Goldstein] owes us $465,000., on a loan arranged thru your office drawn to mature October 15, 1961. After reviewing our anticipated requirements for the immediate future, it has been deemed necessary to exercise the thirty day call privilege in connection with this loan to the extent of calling it for payment on June 20th next.

The bank did not notify Tillie directly, that it was calling said loan; but Garvin-Bantel advised Tillie of the Jersey City bank's decision.

Shortly after the Jersey City bank issued the above letter to Garvin-Bantel, the latter firm contacted the New York brokerage firm of Gruntal & Co., members of the New York and American Stock Exchanges, and arranged for said firm to become the substitute lending institution for handling Tillie's "loan." As the result of this arrangement, Gruntal then wrote a letter to Tillie on June 8, 1959, as follows:

We are writing you at the suggestion of Messrs. Garvin, Bantel & Co., who informed us you wish to carry for your account:

$500,000. U.S. Treasury 1½% due 10/1/62

against an approximate debit of about $435,000. [sic] with 5 points margin to be maintained at all times.

We are willing to carry these for you at an interest rate of ¼% above money cost to us.

In accordance with the above, will you kindly execute the three enclosed cards, necessary for the opening of an account, and return them to us?

On the following day of June 9, 1959, prior to receiving any reply from Tillie, Gruntal went ahead and made arrangements to take over the 1962 Treasury 1½s from the Jersey City bank. Also on that date, prior to receiving any instructions from Tillie, the Jersey City

bank made arrangements to deliver the Treasury note to Gruntal. Alan Stypeck of Garvin-Bantel personally arranged and handled the transaction between Gruntal and the Jersey City bank. There is no evidence that Garvin-Bantel received any fee from Tillie for such service; and Tillie did not deduct any brokerage fee in her 1959 income tax return.

Also on June 9, pursuant to the above-described arrangement, the Jersey City bank delivered the 1962 Treasury 1½s to Gruntal; received in return Gruntal's check for $465,000; and thereupon it marked Tillie's promissory note as being fully paid, and completely closed its account with her. Also at the same time, the Jersey City bank delivered to Gruntal its check for $42,944.61, which it described as being the portion of Tillie's prepaid interest of the $52,596.61 claimed as a deduction in her 1958 return. Gruntal did not pay over to Tillie the amount of this check; but rather Gruntal credited said amount to her account with it.

On June 10, 1959, which was after the Jersey City bank and Gruntal had already consummated the foregoing steps of the transaction, Tillie mailed to the Jersey City bank a letter that had been prepared for her signature, in which she requested the bank to deliver to Gruntal the Treasury 1½s and the check for unearned interest. Also at this same time, Tillie delivered another letter to Gruntal in which she requested it to take delivery of said Treasury notes and the bank's check for unearned interest. In addition, Tillie sent to Gruntal, apparently with the just-mentioned letter, a signed "General Customers Card," wherein she agreed to pay interest (the rate was *not* specified) on the debit balance of her account; and wherein she authorized Gruntal to sell any property of hers that Gruntal might have, and to close out her account if Gruntal for any reason deemed it necessary to do so.

Subsequently on December 1, 1959, Gruntal notified Tillie that it had sold the above-mentioned $500,000 face amount of 1962 Treasury 1½s at 91.26 (or $459,062.50) plus accumulated interest of $1,270.49, and less a commission of $78.13—for a net amount of $460,254.86. Tillie thus sustained a capital loss on this sale in an amount of approximately $5,700.

On the same date of December 1, 1959, Gruntal further notified Tillie that it had bought $500,000 face amount of U.S. Treasury bonds, 2½-percent series, due November 15, 1961 (hereinafter called 1961 Treasury 2½ bonds), at 95.13 (or $477,031.25) plus accrued interest of $583.79 and commission of $78.13, or a total amount of $477,693.17.

Thereafter on February 4, 1960, Gruntal notified Tillie that it had sold one-half of her 1961 Treasury 2½ bonds ($250,000 face amount) at 96.17 (or $241,328.13) plus accrued interest of $1,407.97, less commission of $78.13, or a net amount of $242,657.97. And subsequently,

on June 13, 1960, Gruntal notified Tillie that it had sold the remaining $250,000 of 1961 Treasury 2½ bonds, at 98.26 (or $247,031.25) plus accrued interest of $509.51, less commission of $156.25, or a net amount of $247,384.51. Tillie realized an aggregate gain of $11,015.62 on the two above sales of 1961 Treasury 2½ bonds. Her account with Gruntal was closed out on June 25, 1960.

The rates of interest which were charged to Tillie by Gruntal were from time to time increased during the period of the transaction, from 4 percent to 4⅜ percent, to 4⅝ percent, to 5¼ percent, and finally to 5½ percent.

### Facts re Transactions Involving Treasury 1½s Maturing October 1, 1961

At approximately the same time in December 1958 that Bernard, acting on behalf of Tillie, initiated the above-mentioned "loan" transaction with Garvin-Bantel, he also initiated another similar but separate half-million "loan" transaction with the Royal State Bank of New York (hereinafter called the Royal bank). The record does not establish the details of the negotiations between Bernard and the Royal bank; but it does establish that on December 30, 1958, the president of the Royal bank called C. J. Devine & Co., a dealer in Government securities; and that he then purchased $500,000 face amount of U.S. Treasury notes, 1½-percent series, due October 1, 1961, at 95.6, plus accrued interest of $1,875, or a total of $477,812.50.

On the following day, December 31, 1958, the Royal bank recorded a loan to Tillie of $480,000, on its books of account.[2] And on this same day, Tillie executed a promissory note in favor of the Royal bank in the face amount of $480,000, due June 30, 1960. No rate of interest was specified on said promissory note—said instrument providing only that it was "with interest from and after maturity at the legal rate." Under the terms of this promissory note, the Royal bank could sell the Treasury notes at any time and cancel the loan.

On December 30, 1958, Tillie paid to the Royal bank, by means of a check drawn in her behalf by Bernard as attorney, $28,800—purportedly as prepaid interest on said $480,000 promissory note to its maturity 18 months later.

Subsequently, about 5 months later, on June 3, 1959, the Royal bank wrote the following letter to Tillie:

In view of the continued depreciation in the Government Bond market, which has reduced the value of your collateral, and the rise in interest rates, we herewith request that you either liquidate your loan at this bank or pay us an additional sum of $2,600, which represents [increased] interest of ½ of 1%

---

[2] The record herein does not establish the disposition made by the bank of the difference of $2,187.50 between the "loan" of $480,000 and the "purchase price" of $477,812.50 for the 1961 Treasury 1½s.

per annum on your note of $480,000 for the period of June 1, 1959 to June 30, 1960.

Please advise immediately whether you will liquidate this loan or pay the additional interest charge.

On June 8, 1959, Tillie acting in response to the foregoing, forwarded her check to the Royal bank in the amount of $2,600, purportedly as such additional prepaid interest on her loan.

Subsequently, on September 22, 1959, the Royal bank called for still more collateral; and Bernard thereupon forwarded to the bank, for that purpose, a savings and loan association passbook of Tillie's having a balance of $4,500.

Thereafter on June 10, 1960, the Royal bank informed Tillie that it had sold the above-mentioned $500,000 face amount of 1961 Treasury 1½s at 97.14 (or $487,187.50) plus interest of $1,434.43, or a total of $488,621.93. It then applied $480,000 of such sum against her "loan," and credited the balance of $8,621.93 to her account. In addition, the bank informed Tillie that it was rebating $1,200 of the prepaid interest which had not been earned.

The record contains no evidence that Tillie paid any commission in connection with the "purchase" or the "sale" of the 1961 Treasury 1½s; or that she supplied from her own personal funds or assets, any portion of the cost of the securities purchased.

### *Facts re Economic Consequences of Treasury Obligations Transactions*

On or about January 1, 1959, which was a day or two after both of the above-described transactions had been initiated, Bernard made a computation to reflect the portion of sweepstakes winnings that he expected Tillie would be able to retain after payment of Federal and State income taxes, if his tax-saving plan proved to be successful. Bernard's computation was as follows:

*Estimated calculation of money retained from Irish Sweepstakes*

| Income 1958 | | Disbursements | |
|---|---|---|---|
| [Sweepstakes winnings] | $140, 000. 00 | Federal tax | $13, 914. 04 |
| | | State tax | 8, 807. 66 |
| | | Charities | 1, 300. 00 |
| | | Fees (including 3000 BG [31]) | 6, 500. 00 |
| | | Tip (Katherine) | 1, 000. 00 |
| | | Prepaid interest [to Jersey City and Royal banks] | 81, 396. 61 |
| | 140, 000. 00 | | 112, 918. 31 |
| Less disbursements | 112, 918. 31 | | |
| | 27, 081. 69 | | |

*Estimated calculation of money retained from Irish Sweepstakes*—Continued

| *Income* | | *Disbursements* | |
|---|---|---|---|
| *1959* | | | |
| Interest collected_____ | $15,000.00 | State tax_____ | None |
| Less accrued interest paid_____ | 3,750.00 | Federal tax_____ | $1,700.00 |
| | 11,250.00 | | |
| Less Federal tax_____ | 1,700.00 | | |
| | 9,550.00 | | |
| *1960* | | | |
| Interest 500 M 1 year_____ | 7,500.00 | State tax_____ | None |
| Interest 500 M ½ year_____ | 3,750.00 | Federal tax_____ | 3,800.00 |
| | 11,250.00 | | |
| Capital gain 1961—bonds Estimated S.P.—98%₃₂ Cost—95%₃₂ | | | |
| Capital gain=$15,000_____ | 15,000.00 | | |
| | 26,250.00 | | |
| Less Federal tax_____ | 3,800.00 | | |
| | 22,450.00 | | |
| *1961* | | | |
| Interest 500 M 9 months_____ | 5,625.00 | State tax_____ | 150.00 |
| Estimated capital gain— S.P.—98%₃₂ | | Federal tax_____ | 3,600.00 |
| Cost=92³%₃₂_____ | 26,250.00 | | 3,750.00 |
| | 31,875.00 | | |
| Less Federal and State tax____ | 3,750.00 | | |
| | 28,125.00 | | |

| *Summary of money retained* | | *Federal taxes* |
|---|---|---|
| 1958_____ | 27,081.69 | 13,914.04 |
| 1959_____ | 9,550.00 | 1,700.00 |
| 1960_____ | 22,450.00 | 3,800.00 |
| 1961_____ | 28,125.00 | 3,600.00 |
| [Tillie]_____ | 87,206.69 | 23,014.04 |
| B. G.[3]_____ | 2,200.00 | |
| [Grand total]_____ | 89,406.69 | |

The foregoing computation reflected that Tillie would sustain an economic loss in excess of $18,500 on the two projected bank loan transactions, calculated as follows:

[3] The initials B. G. appearing in the foregoing calculation refer to petitioner's son, Bernard Goldstein. The amounts appearing opposite said initials were paid to Bernard for services in carrying out the securities transaction.

| | | |
|---|---:|---:|
| Total "prepaid interest" outlay to Jersey City and Royal banks___ | | $81, 396. 61 |
| Less: | | |
| Interest on Treasury obligations to be received in 1959_____ $15, 000 | | |
| Deduct accrued interest paid at time of purchase_____ 3, 750 | $11, 250 | |
| Interest to be received in 1960_____ | 11, 250 | |
| Interest to be received in 1961_____ | 5, 625 | |
| Total interest to be received_____ | 28, 125 | |
| Capital gain anticipated in 1960_____ | 15, 000 | |
| Capital gain anticipated in 1961_____ | 26, 250 | 69, 375. 00 |
| Net economic loss_____ | | 12, 021. 61 |
| Add: Fees to Bernard and tax counsel_____ | | 6, 500. 00 |
| Total planned economic loss_____ | | 18, 521. 61 |

Notwithstanding that these computations reflected that Tillie would sustain a total planned economic loss of over $18,500 on the two bank loan transactions, it was believed that she would derive a substantial income tax saving for the year 1958, through deducting in that year against her Irish Sweepstakes winnings, all of the "prepaid interest" to the banks for subsequent periods of from 1½ years to 2½ years.

The way the two bank loan transactions actually worked out, was that Tillie sustained a "total economic loss" on these transactions in the amount of $25,019.01, as shown by the following:

*Transactions with Jersey City bank*

| | | |
|---|---:|---:|
| Prepaid interest_____ | $52, 596. 61 | |
| Less: Unearned portion rebated_____ | 42, 944. 61 | |
| Net interest outlay_____ | | $9, 652. 00 |
| Interest income on Treasury note: | | |
| April 1959 payment_____ | 3, 750. 00 | |
| Less: Accrued interest at time of purchase_____ | 1, 875. 00 | 1, 875. 00 |
| Excess of interest outlay over interest income (loss)_____ | | ($7, 777. 00) |

*Account with Gruntal & Co.*

| | | |
|---|---:|---:|
| Total interest outlay_____ | | $17, 393. 11 |
| Less: Net interest from Treasury notes_____ | | 9, 479. 18 |
| Excess of interest outlay over interest income_____ | | 7, 913. 93 |
| Add: Loss on sale of 1962 Treasury 1⅛s_____ | | 5, 703. 13 |
| | | 13, 617. 06 |
| Less: Gains on sales of 1961 Treasury bonds_____ | | 11, 015. 62 |
| Net excess of interest outlays over interest income and gains (loss) ___ | | (2, 601. 44) |

### Transactions With Royal State Bank

| | |
|---|---:|
| Net total interest prepayments_____ | $30, 200. 00 |
| Less: Interest income received on Treasury notes_____ | 10, 809. 43 |
| Excess of interest outlay over interest income_____ | 19, 390. 57 |
| Less: Gain on sale of 1961 Treasury 1½s_____ | 11, 250. 00 |
| Net excess of interest outlays over interest income and gains (loss)___ | ($8, 140. 57) |

### Recapitulation

| | |
|---|---:|
| Loss on Jersey City bank transactions_____ | ($7, 777. 00) |
| Loss on Gruntal & Co. account_____ | (2, 601. 44) |
| Loss on Royal State Bank transactions_____ | (8, 140. 57) |
| Total_____ | (18, 519. 01) |
| Add: Fees to Bernard and tax counsel, as shown on Bernard's computation_____ | 6, 500. 00 |
| Total actual economic loss to Tillie_____ | (25, 019. 01) |

Tillie and her husband, on the joint income tax return which they filed for the year 1958, deducted the amounts of $52,596.61 and $28,800 (total $81,396.61) which Tillie paid to the Jersey City and Royal banks, respectively. Both of these amounts, as before shown, were paid on December 31, 1958, purportedly as prepaid interest for periods extending for 1½ to 2½ years thereafter. As above found, $42,944.61 of the $52,596.61 deducted by Tillie on her 1958 return in respect of the December 31, 1958, payment to the Jersey City bank, was rebated to her by that bank about 6 months later, following that bank's decision to terminate its transactions with her.

The respondent, in his statutory notice of deficiency herein, disallowed said claimed interest deduction; and he explained such action as follows:

The deduction claimed for alleged interest expense in the amount of $81,396.61 for the taxable year 1958 is disallowed for the reason that the transactions were devoid of profit motive, that the transactions were entered in merely to reduce your federal income taxes, that the transactions constitute a sham consisting of form without substance, and that the $81,396.61 does not constitute a payment of interest on an indebtedness within the purview of section 163(a) of the Internal Revenue Code of 1954.

#### FINDINGS OF ULTIMATE FACT

Tillie's purpose in entering into the transactions with the Jersey City and the Royal banks was not to derive any economic gain or to improve here beneficial interest; but was solely an attempt to obtain an interest deduction as an offset to her sweepstakes winnings.

No genuine "indebtedness" was created by Tillie with either of the above-mentioned banks, within the intendment of section 163(a) of the 1954 Code.

As payments of interest, the transactions with said banks were shams.

## OPINION

We must decide in this case whether, in the light of recent judicial authorities which have construed and applied section 163(a) of the 1954 Code, Tillie is entitled to the deduction of $81,396.61, which she claimed to be prepaid interest on two newly created items of indebtedness, aggregating $945,000. Section 163(a) provides a deduction for "*interest paid* or incurred within the taxable year *on indebtedness.* [Emphasis supplied.]"

In the recent case of *Joseph H. Bridges*, 39 T.C. 1064, 1075, affd. 325 F. 2d 180 (C.A. 4), which involved an issue and facts strikingly similar to those in the instant case, this Court said:

The statute [sec. 163(a)] says nothing about the motive or purpose for incurring the indebtedness and paying the interest and, except as provided in sections 264–267, which are not pertinent here, makes no requirement with respect to the use to which the borrowed money is put. However, the Supreme Court in *Knetsch* v. *United States*, 364 U.S. 361 (1960), and other courts in numerous cases, * * * have indicated that the statutory allowance presupposes that the indebtedness not be a sham or incurred in a sham transaction. This means that the term "interest" as used in the statute has a commercial connotation, that is, regardless of the purpose for which the money is borrowed or the use to which it is put, and regardless of any tax consequences resulting therefrom, the amounts paid as interest must have commercial reality, there must be some valid commercial reason for paying interest, the borrower must in fact receive something in the transaction itself which would warrant the payment of interest. To be deductible the amounts must, in fact, constitute interest—that is, compensation for the use or forbearance of money, * * * paid with respect to genuine indebtedness. * * *

The Court, after reviewing the facts in said case, further stated: "As a payment of interest, this transaction was a sham."

The Court of Appeals for the Fourth Circuit, in affirming the decision of this Court in the *Bridges* case, made the following pertinent statements:

Transactions which are properly characterized as mere shams cannot be given effect for purposes of creating tax advantages, since in order to give that effect to the transaction it must be clear that what was done was, in reality, that which the statute intended. Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L. Ed. 2d 128 (1960); Gregory v. Helvering, 293 U.S. 465, 55 S. Ct. 266, 79 L.Ed. 596 (1935).

Upon the particular facts of this case, we are of the opinion that the Tax Court's finding that as payments of interest on indebtedness the transactions here involved were shams is not only not clearly erroneous but is compelled when

we apply the test set forth by the Supreme Court in Knetsch v. United States, supra.

\*       \*       \*       \*       \*       \*       \*

The test in such a case as the one under review here is not whether the motive or intent of the taxpayer in entering into the transaction was, partially or solely, to decrease or avoid his taxes, but is "whether what was done, apart from the tax motive, was the thing which the statute intended." Knetsch v. United States, supra, 364 U.S. at 365, 81 S. Ct. at 134–135, 5 L. Ed. 2d 128; Gregory v. Helvering, supra, 293 U.S. at 469, 55 S. Ct. at 267–268, 79 L. Ed. 596. It is clear that what was intended by section 163(a) was to create a deduction for all interest paid or accrued on *indebtedness*. The question here is whether the payments made by Bridges to the banks were, in fact, interest, i.e., "compensation for the use or forbearance of money," [3] paid with respect to a genuine indebtedness.[4]

Although the particular transaction involved in the case of Knetsch v. United States, 364 U.S. 361, 81 S. Ct. 132, 5 L. Ed. 2d 128 (1960), consisted of the purported purchase of an annuity contract with funds purportedly borrowed from the insurance company which "sold" the annuity contracts, the repayment of the "borrowed" funds being secured by the annuity contracts, the principles there laid down by the Supreme Court are not only applicable, but controlling, in the determination of the instant case.[5]

\* \* \* The Court in Knetsch held that the tax reduction motive or intent is immaterial in such cases and that the determinative question as to "whether what was done apart from the tax motive, was the thing which the statute intended" is answered in the negative if it is apparent "that there was nothing of substance to be realized by [the taxpayer] from [the] transaction beyond a tax deduction." There the Court concluded that it was clearly apparent that "Knetsch's transaction with the insurance company did 'not appreciably affect his beneficial interest except to reduce his tax.'" In view of such a finding, the Court held that the transaction was a sham and did not create an "indebtedness" within the intent of the interest deduction statute. \* \* \*

\* \* \* In the instant case Bridges entered into two transactions, as to each of which he agreed to and did pay out substantially more money than he could even hope to recover from any increase in value of the securities he purchased. In other words, it is clear that there was no prospect whatever of any financial profit from the transactions alone. \* \* \* In neither case did Bridges, *at any time*, have the uncontrolled use of additional money, of the securities he had purchased or of the interest on the securities. \* \* \* there was never any benefit extended by the banks to Bridges and never any risk assumed by the banks. Assuredly, taxpayer did not receive money or equivalent economic benefits in the amount of the bank loans. Actually, no real indebtedness was created and the Tax Court was fully justified in finding that, as payments of interest "on indebtedness," the transactions were shams. Paraphrasing the language of the Supreme Court in Knetsch, it is patent that there was nothing of substance to be realized by Bridges from either transaction beyond a tax deduction; and plainly the transactions did not in any wise affect his beneficial interest except to reduce his tax.

Bridges relies quite heavily upon \* \* \* L. Lee Stanton, 34 T.C. 1 (1960). The Stanton case is clearly distinguishable on its facts from the instant case. \* \* \*

[Also] it will be noted that the case was decided prior to and without the benefit of the decision of the Supreme Court in Knetsch. * * * [Footnotes omitted.]

As regards the Supreme Court's decision in the *Knetsch* case which was cited and relied upon in the opinion of this Court and that of the Fourth Circuit in the *Bridges* case, we deem it unnecessary to here further review the principles which the Supreme Court therein enunciated. It should be noted however, that the Supreme Court in deciding said case, cited with approval the dissenting opinion of Judge Learned Hand in *Gilbert* v. *Commissioner*, 248 F. 2d 399, 411 (C.A. 2), wherein it was stated:

The Income Tax Act imposes liabilities upon the taxpayers based upon their financial transactions, and it is of course true that the payment of the tax is itself a financial transaction. *If, however, the taxpayer entered into a transaction that does not appreciably affect his beneficial interest except to reduce his tax, the law will disregard it; for we cannot suppose that it was part of the purpose of the act to provide an escape from the liabilities that is sought to impose.* * * * [Emphasis supplied.]

In the instant case, after carefully reexamining and reweighing all the evidence and also after carefully reconsidering all pertinent judicial authorities (as was urged upon us by the petitioners in their above-mentioned motion for reconsideration), we have concluded that this case is indistinguishable *on principle* from the above-cited *Knetsch* and *Bridges* cases; and that (to adopt the words of the Fourth Circuit) "the principles * * * laid down by the Supreme Court [in the *Knetsch* case] are not only applicable, but controlling, in the determination of the instant case." We have further concluded and have heretofore found as an ultimate fact, that (as we said in the *Bridges* case), "As payments of interest, the transactions [with the banks here involved] were shams." And thus it follows that the deductions here in controversy are not allowable.

A careful weighing of the relevant evidence convinces us that there was no genuine indebtedness established between Tillie and either the Jersey City bank or the Royal bank. Despite Tillie's assertion that she was borrowing almost a million dollars from these banks, not a single officer or employee of either bank ever laid eyes on Tillie Goldstein. Neither bank made any investigation or check of the credit standing or financial status of either Tillie or of her husband. In our judgment, there was never any intention to establish a bona fide debtor-creditor relationship between Tillie and the banks. Rather, we think that the banks were looking to the Treasury obligations (and not to the purported debtor, Tillie) to recover the funds which, in their entirety, had been supplied by the banks to acquire said Treasury obligations. In this connection, it is to be noted that Tillie actually did not expend so much as a penny for the Treasury obligations, despite the fact that she claims she was investing therein. All of

the money which she paid to each bank was for so-called prepaid interest.

It appears to us that a transaction, such as Tillie entered into with the Jersey City and Royal banks, represents in substance and reality, an investment *by the bank* in Treasury obligations; wherein the bank, in consideration for prepayment to it of "interest" by a customer such as Tillie (at a higher rate than that which the Treasury obligations would yield), would carry such Treasury notes in the customer's name as purported collateral for the "loan." The foregoing would serve to lend a semblance of color to any assertion of the customer that he was indebted to the bank, and that what he paid to the bank was interest, deductible for Federal income tax purposes. But, as our above holding reveals, we do not believe that there would, in such circumstance, be any genuine indebtedness between the bank and its customer. And if it is necessary to characterize the customer's payment, we would say that it was a fee to the bank for providing the "facade" of a loan transaction. Cf. *Knetsch* v. *United States*, 364 U.S. 361, 366.

Still guided by the *Knetsch* and *Bridges* cases, we further look to see whether in the instant case, Tillie's transactions with the banks could appreciably affect her "beneficial interest" in any way except to reduce her tax. If saving 1958 income taxes was the only significant benefit to be derived by her, then the *Knetsch* and *Bridges* cases require that the deduction for so-called prepaid interest must be denied. In terms of prepaid interest expense plus the fee to Bernard and tax counsel versus interest income, these transactions necessarily had to produce losses, as is shown in the following computation based upon our findings of fact:

| | Royal bank (18-month promissory note) | Jersey City bank (2 year 9½-month promissory note) | Total |
|---|---|---|---|
| Prepaid interest | $28,800 | $52,596.61 | $81,396.61 |
| Interest income (1½% per year) | 11,250 | 20,937.50 | 32,187.50 |
| Excess of interest expense over interest income | 17,550 | 31,659.11 | 49,209.11 |
| Add: Fee to Bernard and to tax counsel | 3,250 | 3,250.00 | 6,500.00 |
| Total loss (not including income taxes on interest income) | 20,800 | 34,909.11 | 55,709.11 |

To recoup the above losses, Bernard's plan relied upon sales of the Treasury notes at higher prices than were paid for them. But, in order for Tillie to just break even without any profit on the prepaid interest and counsel fees totaling $87,896.61 which she had tied up in these transactions, the Treasury notes involved would have had to be sold for approximately par, exclusive of brokerage commissions. And for Tillie to have realized anything substantial beyond recovering her said outlay, the Treasury notes would have had to be sold con-

siderably in excess of par, notwithstanding that they bore interest of only 1½ percent, and were to mature at par only a very short time later.

Moreover, the foregoing computations are weighted in Tillie's favor, for they do not reflect any of the Federal or State income taxes which would definitely burden the interest income on said Treasury notes, and also would definitely burden any gain realized on their subsequent sale.

Included in our Findings of Fact is another computation, based on estimates made by Bernard on or about January 1, 1959, which shows that Tillie's transactions had a built-in, planned economic loss of $18,521.61; and our findings further reveal that Tillie's transactions actually resulted in a loss to her of $25,019.01.

Interest is the compensation for the use or forbearance of money. *Deputy* v. *du Pont*, 308 U.S. 488. In the instant case, Tillie did not at any time have either uncontrolled use of any additional money, or of the securities which were purchased ostensibly for her.

In the light of all the foregoing, we are impelled to conclude, in line with our finding of ultimate fact, that there was nothing of substance to be realized by Tillie from her transactions with the banks, except a tax deduction. Tillie did not have and could not reasonably have had any purpose or intention through the foregoing transactions to appreciably affect her beneficial interest except to reduce her taxes. Absent the significant income tax savings inuring to Tillie from deducting at one fell swoop in 1958, all of the "prepaid interest" for periods of 1½ to 2½ years thereafter, Tillie's putative borrowing transactions do not make sense either commercially or economically.

Tillie places strong reliance upon this Court's opinion in *L. Lee Stanton*, 34 T.C. 1. That case is distinguishable here for the reasons set forth in *Max Barnett*, 44 T.C. 261 (decided this day).

We hold that the deductions claimed by Tillie on her 1958 return for amounts paid to the Jersey City and Royal banks as prepaid interest, do not represent "interest paid * * * on indebtedness" within the intendment of section 163 (a) of the 1954 Code; and accordingly that such deductions are not allowable. The respondent's determination is sustained.

Reviewed by the Court.

*Decision will be entered for the respondent.*

FORRESTER and HOYT, *JJ.*, dissent.

———

FAY, *J.*, dissenting: It is clear that a taxpayer has a legal right to decrease the amount of what would otherwise be his taxes or altogether avoid them. *Bridges* v. *Commissioner*, 325 F. 2d 180 (C.A. 4, 1963),

affirming 39 T.C. 1064 (1963). The test in such a case as the one at bar is not whether the motive or intent in entering into the transaction was, solely or partially, to decrease or avoid taxes, but is "whether what was done, apart from the tax motive, was the thing which the statute intended." *Bridges* v. *Commissioner*, *supra* at 184. Unlike other deduction provisions, section 163 does not require that the expenditure be ordinary, necessary, reasonable, or in connection with a transaction entered into for profit. It is clear that what was intended by section 163(a) was to create a deduction for *all* interest paid or accrued on indebtedness. *Bridges* v. *Commissioner*, *supra*.

I disagree with the majority's conclusion that there was no genuine indebtedness established between Tillie and either the Jersey City bank or the Royal bank. Upon careful scrutiny of the record, I am convinced that the transaction in question was not merely an exercise in financial mummery.[1] Whatever her ultimate purposes, I do not doubt that Tillie contracted an actual indebtedness in the usual sense of the term.

In its Findings of Fact and in the body of its Opinion, the majority points out certain aspects of the loan transaction upon which it concludes that no genuine indebtedness was created. However, the record clearly indicates that the loan transaction was in every respect regular and, moreover, indistinguishable from any other legitimate loan transaction contracted for the purchase of Government securities. To hold that the indebtedness in issue is not genuine because it fails to meet certain theoretical judicial standards which have no counterpart in commercial practice places an unwarranted construction on the terminology employed in section 163. Although the interest deduction is purely a creature of tax law, indebtedness and payment of interest thereon is a common transaction in the nontax field. Since the terms "interest" and "indebtedness" are used in the Code without limiting definition and without legislative history indicating a contrary result, their *common and ordinary meaning* in the commercial field should at least be persuasive of their meaning as used in the Internal Revenue Code. Compare *Commissioner* v. *Brown*, 380 U.S. 563 (1965).

Regardless of how the transactions in issue are viewed, I have no doubt that the loan and note, the purchase and pledge of collateral,

---

[1] That is to say, the transaction involved here is not similar to that presented in *Eli D. Goodstein*, 30 T.C. 1178 (1958), affd. 267 F. 2d 127 (C.A. 1, 1959), and the cases which might be described as the progeny of the tax-canny Livingstone, i.e., *Sonnabend* v. *Commissioner*, 267 F. 2d 319 (C.A. 1, 1959), affirming per curiam a Memorandum Opinion of this Court; *Broome* v. *United States*, 170 F. Supp. 613 (Ct. Cl. 1959) ; *George G. Lynch*, 31 T.C. 990 (1959), affd. 273 F. 2d 867 (C.A. 2, 1959) ; *Leslie Julian*, 31 T.C. 998 (1959), affirmed sub nom. *Lynch* v. *Commissioner*, 273 F. 2d 867 (C.A. 2, 1959) ; *Egbert J. Miles*, 31 T.C. 1001 (1959). See also *Gordon MacRae*, 34 T.C. 20 (1960), affirmed in part and remanded in part 294 F. 2d 56 (C.A. 9, 1961).

and the sale and satisfaction of the loan were in every respect genuine financial and commercial transactions upon which tax consequences should be based. In sum effect, I believe Tillie actually paid, as interest, with respect to the aforesaid borrowings, some $80,000. Hence, I find no substance to the majority's determination that there was no debtor-creditor relationship.

The majority opinion is not confined to presenting the factual conclusion that no true indebtedness existed. It suggests that even if the loan transaction met the literal requirements of the provisions authorizing interest deductions, it lies outside the "intent" of the statute and is, in that respect, a "sham." This amounts to saying that the transaction was a sham because entered into for the "wrong" motives—that is, for tax-reduction motives.

The majority opinion indicates that the transactions involved constituted merely a sophisticated tax-avoidance scheme destined to produce nothing in the way of an economic reward except a substantial reduction in taxes.[2] But this describes neither a sham transaction, nor one unmarked by events or risks beyond the control of the taxpayer, nor one different in substance and effect from what it appeared to be on its face. *Fabreeka Products Co.* v. *Commissioner*, 294 F. 2d 876 (C.A. 1, 1961), remanding 34 T.C. 290 (1960). Although the existence of a tax motive creates the necessity for a searching inquiry into the substance of a transaction, it is my opinion that a transaction which in substance creates a real indebtedness (upon which interest is due and paid) need not be entered into with the affirmative motive of "investment" in order to come under section 163. *Fabreeka Products Co.* v. *Commissioner, supra.* That is to say, I do not believe that motives of tax avoidance can so contaminate an otherwise legitimate transaction as to rob it of all reality. *Commissioner* v. *Brown, supra.*

I believe that the case at bar is controlled by this Court's holding in *L. Lee Stanton*, 34 T.C. 1 (1960). The transactions in issue involved just as real and bona fide borrowings by Tillie as the loan which Stanton obtained; and, hence, the instant case cannot be distinguished on its facts from *Stanton.*

In *L. Lee Stanton, supra* at 7, this Court pronounced with respect to section 23(b), I.R.C. 1939, now section 163, I.R.C. 1954:

Congress having enacted the only exceptions it desired to make [see sec. 163(d)], the maxim of interpretation, "*Inclusio unius est exclusio alterius*" applies, e.g.,

---

[2] In the majority opinion it is stated:

"* * * there was nothing of substance to be realized by Tillie from her transactions with the banks, except a tax deduction. Tillie did not have and could not reasonably have had any purpose or intention through the foregoing transactions to appreciably affect her beneficial interest except to reduce her taxes. Absent the significant income tax savings inuring to Tillie from deducting at one fell swoop in 1958, all of the 'prepaid interest' for periods of 1½ to 2½ years thereafter, Tillie's putative borrowing transactions do not make sense either commercially or economically."

Congress intended no other exception or limitation on the deductibility of interest on indebtedness. All interest paid within the taxable year on genuine indebtedness of any other kind thus entitles a cash basis taxpayer to a deduction of the amount of interest paid. * * *

This Court emphasized this point by stating:

Congress has indicated that this deduction is not dependent in any other way upon the purpose or motive of the borrower, or the use made of the borrowed funds. * * *

The legislative history of the interest deduction provisions set out in Stanton clearly shows that "Congress has repeatedly considered and ultimately rejected limitations somewhat comparable to the one now urged by the Commissioner" for support of his position.

The majority opinion cites *Knetsch* v. *United States*, 364 U.S. 361 (1960), and *Joseph H. Bridges*, 39 T.C. 1064 (1963), aff'd. 325 F. 2d 180 (C.A. 4, 1963), as determinative of the case at bar.[3] I do not read the decision of the Supreme Court in *Knetsch* as invalidating this Court's earlier decision in *L. Lee Stanton, supra*,[4] nor as supporting the majority's position here. In *Knetsch*, the taxpayer purchased a so-called annuity by borrowing, on nonrecourse notes,[5] the purchase price from the very insurance company which issued the annuity. The annuity served as the insurance company's collateral on the loan. The guaranteed yearly increment in cash value was substantially less than the interest to be paid on the purchase loan. Knetsch's annual borrowing of the annuity's yearly increase in cash value would, if continued (and the Court assumed it would), keep the annuity's net cash value at the "relative pittance of $1000." The annuity payments were scheduled to begin upon Knetsch's reaching 90 years of age. In *Knetsch*, the very company making the loan was the one issuing the "paper" to serve as collateral. In practical effect, there was little more involved than counterbalancing book liabilities. As the Supreme Court pointed out, the difference between Knetsch's payment of interest and the amount of cash value which he borrowed constituted a fee retained by the insurance company for providing the facade of a loan whereby the taxpayer sought to reduce his taxes in the total sum of $233,297.68.

The Supreme Court in *Knetsch* did not purport to be reshaping either the usual interpretation of "indebtedness" for the purpose of the interest deduction or the usual interpretation of "interest" in tax law. The Supreme Court emphatically put aside the trial court's finding that Knetsch's "only motive in purchasing [the] bonds was to attempt to secure an interest deduction." Motive was not relevant because, said

---

[3] The majority opinion states: "If saving 1958 income taxes was the only significant benefit to be derived by her, then the *Knetsch* and *Bridges* cases require that the deduction for so-called prepaid interest must be denied."

[4] See *Clifford F. Hood*, T.C. Memo. 1961–231.

[5] In the instant case, Tillie's promissory note was clearly issued *with recourse*.

the Supreme Court, quoting from its often cited *Gregory* v. *Helvering*, 293 U.S. 465, 469 (opinion), "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." In this regard, the Supreme Court's concern was whether the annuity contract arrangement did involve an indebtedness in the usual sense of the term. The Supreme Court did not hold that the interpretation of indebtedness carries a qualification as to the purpose for which the obligation is incurred. Consequently, I believe that the decision in *Knetsch* was confined to the particular facts presented therein, i.e., that no true indebtedness existed regardless of the taxpayer's motive.

Unlike the present case, the transaction in *Knetsch* merely provided an arrangement mutually benefiting the parties without creating a true obligation to pay interest. In the instant case, I believe that the loan transaction was not a fiction. Instead, the transaction was real, the indebtedness genuine, even though the motive of Tillie *may* have been purely one of achieving a tax rather than economic gain. The jural relationship established between the banks and Tillie was one of indebtedness in the usual sense that term is used and in the sense that term is used in tax law.

I believe that the decision of this Court in *Bridges* is distinguishable on its face from the instant case. In *Bridges*, the record provided this Court with a confusing if not irregular set of facts. In one transaction, the taxpayer was able to purchase bonds below market price, which bonds were redeemed by the bank which made the loan. In another transaction, the taxpayer sold bonds above the market (1) subject to a call option on the part of the lender at par (far in excess of the market value) 1 month later, and (2) subject to a sale option on the part of the taxpayer at par 1 month later. In both the transactions, the loan amount was in excess of the market value of the bonds. This Court stated, at page 1077:

We are convinced that there was never any intent or thought between the parties that petitioner was incurring a real personal indebtedness or obligation. * * *

The Court held that *Stanton* was distinguishable since, in *Stanton*, the transactions were bona fide and real and created a genuine indebtedness. Unlike *Bridges*, there is nothing in the transactions in the case at bar to suggest irregularity.

To hold for respondent in the instant case despite the existence of a genuine indebtedness would (1) engraft upon section 163 a qualification and penalty unwarranted by the literal language and intendment [6] of that provision and (2) extend the limited opinion of the Supreme Court in *Knetsch*, in a manner not consonant with our judicial function. Although as a court and as this Court in particular we must be

[6] See *L. Lee Stanton*, 34 T.C. 1 (1960).

mindful of the necessity of revenue gathering, we cannot be solicitous to that process. Our duty requires us to be solicitous to the law alone as it is written. I "consequently deem it wise to 'leave to the Congress the fashioning of a rule which, in any event, must have wide ramifications.'" *Commissioner* v. *Brown, supra.*

FORRESTER, TRAIN, DAWSON, and HOYT, *JJ.*, agree with this dissent.