CARL PELLMAN AND RENATE PELLMAN, WILLIAM RASHBAUM AND MARY BLAIR RASHBAUM, BRIAN LIPTON AND LOIS LITPON, AARON ESMAN AND ROSA ESMAN, WILLIAM RASHBAUM, Petitioners v. COMMISSION OF INTERNAL REVENUE, Respondent
PELLMAN v. COMMISSION OF INTERNAL REVENUE
Docket No. 12532-83.
United States Tax Court
T.C. Memo 1988-37; 1988 Tax Ct. Memo LEXIS 38; 55 T.C.M. (CCH) 24; February 4, 1988; As amended February 4, 1988 Larry Kars and Hartley Chazen, for the petitoners. Charles W. Maurer, Jr., for the respondent. WRIGHT
MEMORANDUM FINDINGS *40 OF FACT AND OPINION Wright, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Petitioner
Taxable Year
Deficiency
Carl & Renate Pellman
1974
$  7,593
1975
10,648
1976
4,940
1977
3,926
1978
2,487
William Rashbaum
1974
6,391
William & Mary Blair
Rashbaum
1975
13,624
1976
7,705
1977
2,729
1978
2,082
Brian & Lois Lipton
1974
7,666
1975
11,644
1976
7,106
1977
2,335
1978
2,183
Aaron & Rosa Esman
1974
8,558
1975
13,970
1976
6,242
1977
2,218
1978
2,083
Petitioners are limited partners in a limited partnership named "Copperidge Properties Associates" (Copperidge). Copperidge was formed in November of 1974 for the purpose of purchasing and distributing a motion picture entitled "Prisoner in the Middle" (hereinafter sometimes referred to as the firm). The issues for decision are (1) whether respondent properly disallowed petitioners' deductions and credits taken with respect to their interests in Copperidge, *41 (2) whether respondent properly disallowed petitioners' interest deductions taken with respect to a promissory note given as consideration for the film, and (3) whether petitioners are liable for the additional interest provided by section 6621(c). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. At the time of filing the joing petition, all petitioners resided in New York, New York. Each petitioner used the cash basis method of accounting. Each petitioner, or his representative, executed valid agreements with respondent extending the period of assessment. The General Partners
Copperidge was a limited partnership organized by William M. Noe II and John W. Conlin under the laws of the State of New York on November 7, 1974. These two individuals were the partnership's only general partners. Petitioners herein were among *42 the partnership's 15 limited partners. William M. Noe II (Noe) was an investment counsellor. After receiving an M.B.A. from Harvard, Noe went to work with a real estate development firm. He moved to Joel Productions, Inc., a film production company run by Kirk Douglas, the actor, but Noe worked only on financial and investment planning projects. This was the extent of Noe's involvement with movie production. He left Hollywood to join the Navy. After completing his tour of duty, he went to New York City where he sold investments of various kinds including stock and real estate. In 1973, Noe formed the Asset Development Corporation (Asset Development), a corporation organized under the laws of New York, which provided investment counselling and promoted investment transactions. Asset Development's ventures included oil and gas properties, real estate, and cattle investment promotions. In 1973 and 1974, Noe invited John W. Conlin (Conlin), a social acquaintance, to join Asset Development. A Briton by birth, Conlin had come to the United States as a representative for a British film distribution company. In 1971, Conlin left British Lion Films, Ltd., and went to work first *43 for E. F. Hutton, Inc., and finally for a cattle investment fund registered with the Securities and Exchange Commission. Noe hoped that Conlin's experience and personal contacts would help Asset Development expand into the entertainment industry. There was no evidence that Conlin's experience was in either production or distribution of films. The Purchase of the Film
In the summer of 1974 Noe and Conlin learned from Noe's attorney that the film, "Prisoner in the Middle" was available for sale. Initial inquiries indicated that the stated selling price of the movie was $ 4,000,00 or $ 5,000,000. At that price Noe and Conlin were not interested. "Prisoner in the Middle," originally entitled "Sabra Command," was an action film shot in Israel by an independent Israeli production company. David Janssen, the star, portrayed an American Air Force Colonel who was assigned to retrieve and disarm an American nuclear warhead which had been inadvertently dropped in the desert. The warhead had been seized by guerillas fighters from the Palestine Liberation Organization (the PLO) who proceeded to capture Janssen when he arrived in the desert. An Israeli patrol attacked, driving off *44 the PLO guerillas and taking both Janssen and the warhead into custody. The PLO attempted to recapture the warhead in a terrible battle in which everyone died except Janssen. The film was rated "R." At the time the film was made, David Janssen was a popular star, known primarily for his role in "The Fugitive" a television action show. The rest of the cast would have been unknown in the United States. Similarly, Buddy Ruskin, the screenwriter and producer, and John O'Connell, the director, were not known in the United States. Still contemplating purchasing the film, Conlin contacted David Blake (Blake). Conlin had met Blake while they were both working for British Lion Films, Ltd. In 1974 Blake was Director of Special Projects for Worldwide Enterprises, Inc. (Worldvision), an established distribution company. Worldvision had started as a subsidiary of the major national television network, ABC, but by 1974 had become an independent international distributor for television programming. Worldvision primarily distributed films which were produced for television (made-for-television films). It was not a major distributor with respect to either domestic or foreign theatrical releases. *45 Blake's job with Worldvision was to seek out new programs and films which might be available for distribution to television stations. Conlin approached Blake for two reasons. First, he wanted Blake's experienced prognosis for the chances of "Prisoner in the Middle." Secondly, he wanted to offer the film to Worldvision for distribution, if he and Noe decided to purchase it. Blake thought the movie was a good made-for-television film, perhaps even up to the level of "movie of the week" quality. If the film were successfully distributed in a domestic theatrical release Blake thought it would be marketable to television programmers. In essence, the television success would depend on an initial theatre exposure. Blake told Conlin that, if the theatrical release were successful, the film could produce revenue in an amount between $ 250,000 and $ 400,000 in television syndication [2] and as much as $ 150,000 as a late night movie [3] on television. [4] He also informed Conlin that there would be incidental costs associated with readying the film for television airing. *46 Conlin and Blake agreed to a distribution arrangement. The film would be distributed by a domestic theatrical distributor for the first 30 months and then Worldvision would distribute the film to domestic and foreign television programmers and to foreign theaters for a period of 25 years. Worldvision guaranteed distribution receipts of $ 50,000, payable in advance, which would be reimbursed out of future proceeds. The distribution fee would be a percentage of gross receipts which varied depending on the market to which the film was licensed. [5] The contract provided that upon default on the note payments the ownership of the film would revert to America on the Move Production, Inc (America on the Move), the prior owners. However, even if the film's ownership changed, the contract with Worldvision would continue. At this time Conlin and Noe also arranged for the theatrical release of "Prisoner in the Middle" with World Wide Films Corporation *47 (World Wide). Conlin and Noe learned of World Wide from the film's producer [6] and did not make an independent investigation into World Wide's reputation. Noe and Conlin offered World Wide the exclusive right to show the film in theatres in the United States. The contract further promised that for the first 30 months of the contract period the film would not be released on television. A prior or simultaneous television release was considered detrimental to the theatrical success of the film. In addition, World Wide promised to spend at least $ 100,000 up front on the distribution effort without reimbursement from Copperidge. World Wide's representative, Charles Hamilton (Hamilton) promised to have the film shown at least 500 times in not less than 25 major cities in the United States and that 50 of those play dates would occur before December 31, 1974. Hamilton promised that the film would be shown at a first-run *48 theater in New York City within the first year of the contract period. The distribution fee was payable on a staggered schedule: for the first $ 300,000 of gross revenues World Wide would retain 65 percent, from the next $ 300,00 World Wide would receive 55 percent and World Wide would keep 50 percent of gross revenues in excess of $ 600,000. World Wide also promised to provide monthly statements and remittances, when due, for the first 18 months of the contract period. Encouraged by their success at securing distribution contracts, Noe and Conlin proceeded with the negotiations to buy the film. Nicholas Torzeski (Torzeski) represented the actual owner of the film, America on the Move. Noe and Conlin learned from Torzeski's attorney, apparently without Torzeski's permission, that the film's production expenses had exceeded budget and that the laboratory refused to release the film until Torzeski had paid his overdue bills. Torzeski's attorney also told Noe and Conlin that the actual production costs had been approximately one million dollars. This figure was not substantiated until well after the purchase. [7] According to Noe, he and Conlin, armed with this information, negotiated *49 aggressively and eventually settled with Torzeski on a purchase price in the amount of $ 1,250,000. Noe maintained that Torzeski's ultimate willingness to settle was due, in part, to Worldvision's offer to distribute the film in domestic and foreign television markets. The terms of the sale required a payment of $ 195,000 in cash and the execution of a promissory note in the amount of $ 1,055,000. The note was nonrecourse, payable over a 10-year term and carrying an interest obligation at the rate of 7 1/4 percent. The first $ 50,000 of distribution revenues would be the first payment on the note. [8] Subsequently, 80 percent of all distribution receipts would be devoted to paying off the note until the entire debt had been satisfied. [9] In addition to the usual conveyances of licenses and rights, the parties agreed that Torzeski would retain exclusive distribution rights with respect to the State of Israel. Torzeski retained a purchase *50 money security interest in the film. Formation of Copperidge
Noe and Conlin formed a limited partnership to invest in "Prisoner in the Middle." In the summer of 1974, they approached Robert Flamm (Flamm), a certified public accountant who had worked with Noe before. Flamm expressed interest on behalf of himself and several of his clients. Offering materials were prepared and circulated and, in the fall of 1974, petitioners became limited partners in Copperidge. Because none of the petitioners testified, there is scant information about them. All of the male petitioners were medical doctors at the time the petition was filed. Petitioner Renate Pellman was an administrative assistant, petitioner Mary Blair Rashbaum was a psychotherapist, petitioner Lois Lipton was a therapist and petitioner Rosa Esman was a publisher. There was no evidence introduced to indicate that any *51 of the petitioners had experience in the production or distribution of entertainment films. The promotional materials, the "Confidential Descriptive Memorandum" (the memorandum), outlined the economic and tax consequences of the Copperidge investment to prospective limited partners. In bold letters, the promotional memorandum warned that an investment in Copperidge was highly speculative. The partnership interests were restricted to persons whose incomes were in the 50 percent bracket under the Federal income tax because "the very high risk of the Partnership's proposed investment may be reduced for such persons" and because "it is expected * * * that each partner would be entitled to a significant tax deduction, at least in the earlier years." Only potential investors whose net worth was equal to at least $ 100,000 were invited to join Copperidge. The memorandum, dated October 10, 1974, described the distribution contracts with World Wide and Worldvision as well as the purchase contract with America on the Move. The memorandum explained that because America on the Move would receive 80 percent of the distribution proceeds, the film would need to generate $ 2,000,000 in revenue *52 from theatrical sources and $ 500,000 in revenue from television distribution in order to cover the balance of the purchase price. The memorandum warned that in the calendar year 1973, fewer than 200 of the films which were released to theatres in the United States grossed more than $ 2,000,000. Noting that the first 18 months of distribution were the most important, the memorandum warned that the film would be repossessed if net receipts were insufficient to meet the promissory note payments. The memorandum anticipated gross receipts in the amount of $ 3,500,000 during the first 18 months. There were no breakdowns or forecasts included in the memorandum to substantiate this claim. The experts referred to in the memorandum were never identified. No appraisals or experts' reports were included in the memorandum. The memorandum also discussed the tax consequences of owning a partnership interest in Copperidge. As described in the memorandum, the tax benefits would flow from the investment tax credit, the immediate expensing of certain costs, and the amortization of the purchase price, using the income forecast method. The memorandum warned potential investors that some of the *53 tax benefits might be disallowed by respondent and that tax legislation was then pending in Congress which might limit the investors' enjoyment of these tax benefits. The memorandum advised prospective investors to seek independent counsel before subscribing. The discussion of the tax benefits available from an investment in Copperidge reflected the advice given Noe and Conlin in an opinion letter from the law firm of Monasch, Ghazen & Stream. In autumn of 1974, three of petitioners submitted applications to Copperidge and made subscription payments [10] in the following amounts: Name
Date
Amount
William Rashbaum
Oct. 25, 1974
$ 13,965
Carl M. Pellman
Oct. 25, 1974
13,965
Aaron H. Esman
Nov. 4, 1974
13,965
A second "Confidential Descriptive Memorandum" was issued on November 25, 1974 and sometime afterwards Brian Pl Lipton subscribed to Copperidge with a payment in the amount of $ 13,965. [11]
*54 The Distribution History
World Wide took possession of the film on November 21, 1974. On December 25, 1974, the film opened at the Picfair Theatre in Los Angeles, California. The Picfair was a second-run theatre in a semi-industrial, run-down neighborhood, although Conlin and Noe did not know that. "Prisoner in the Middle" was being shown alternatively as a double feature with "Exodus" or as a triple feature with "Exodus" and "So Evil My Sister." Hope for 50 play dates before December 31, 1974, soon evaporated as "Prisoner in the Middle" made a disappointing showing. The film played at the following dates and places: Theatre
Location
Play dates [12]
Picfair
Los Angeles, Calif.
Dec. 8 to Dec. 24
Orangeburg Drive-In
Orangeburg, S.C.
Dec. 26 to Dec. 29
By Pass Drive-In
Bennetsville, S.C.
Dec. 26 to Feb. 9
Waco Drive-In
Goldsboro, N.C.
Dec. 27 to Jan. 1
In April of 1975, Hamilton wrote Conlin admitting that the original forecasts *55 were "overly optimistic," attributing the disappointing beginning to the public's lack of interest in disaster films. In this letter Hamilton suggested that under a more realistic forecast "Prisoner in the Middle" would gross $ 500,000 rather than $ 3,500,000. Hamilton noted that the distribution effort was further hampered by Janssen's unavailablility for promotional work. Conlin passed this information along to the limited partners in a letter in which he mentioned a tentative promotional campaign with personal appearances by Janssen. Noe and Conlin, dismayed by the lackluster theatrical release, tried to convince Hamilton to allow the film to go into early television distribution. Hamilton refused to waive the 30-month protection against television distribution. Instead he changed the title of the film to "Warhead" in the hopes that a shorter, catchier title would create a more successful theatrical release in 1975. In writing to the limited partners on August 4, 1975, Conlin attributed the film's dismal beginning to a prevalent "anti-war sentiment" and sent a list of anticipated play dates for the summer. The list included 39 theatres in Texas, Colorado, Arkansas, Mississippi, *56 Nevada and Tennessee, 17 of which were drive-ins. The February of 1976, Noe informed Hamilton that Copperidge would not fund any new promotional schemes and asked him about World Wide's plans for further distribution. On April 6, 1976, Hamilton responded, expressing renewed hope for the film with the new title "Warhead." Hamilton further reduced the estimate of total earnings from $ 500,000 to $ 4,000. In 1976, there was no distribution income at all despite the new title. By March of 1976, the film had generated total collections in the amount of $ 289.35 and had accrued costs in excess of income, leaving a net negative balance in the amount of $ 103.46. In 1977, the film was transferred for television distribution to Worldvision. Worldvision licensed the film to CBS, the major broadcasting network, as part of a package of films and it was shown on August 24, 1977. The cumulative total sales attributable to the film was $ 453,628 by June 30, 1984. No payments to the partners were made until 1978, after Worldvision recouped its advance payment in the amount of $ 50,000. During 1974 and 1975, Copperidge made payments for services rendered to the partnership. Copperidge paid *57 fees to Noe, Conlin and Asset Development which included the salaries due the general partners, pursuant to the partnership agreement, and various costs associated with readying the film for exploitation prior to the formation of the partnership. The sums paid by Copperidge to Monasch, Chazen & Stream represented payments for legal fees, including the opinion letter. Copperidge made payments to Wiesenthal and Goldstein, the writers of two expert appraisal letters. Flamm, the partnership's accountant received a fee. Copperidge paid $ 50,000 to America on the Move which was the advance payment made by Worldvision and promised in the distribution contract. Most of these fees were capitalized. The partnership returns filed for the taxable years 1974 through 1978 show the following items of income and loss: ITEM
1974
1975
1976
1977
1978
Income:
Gross Receipts [13]
$    50,000 -0-   -0-   $ 16  $ 6,335 Cost of Goods Sold
-0-   -0-   -0-   -0- -0- Gross Profit
50,000 -0-   -0-   16  6,335 Interest
-0-   -0-   -0- -0- 130      TOTAL INCOME
50,000 -0-   -0-   16  6,445 Loss:
Amortization
77.80 466.78 294,965 89,095 84,997 Interest [14]
433.35 50,371.23 -0-   -0-   -0-   Depreciation [15]
130,493.00 517,574.39 -0-   -0-   -0-   Deductions [16]
31,077.52 100.00 60 5 5 TOTAL LOSSES
162,081.67 568,312.40 295,567 89,100 85,002 NET INCOME/LOSS
(112,081.67)
(568,312.40)
(295,567)
(89,084)
(78,537)
*58 Appraisals
According to Noe, he and Conlin had the film *59 appraised by two entertainment film experts by the names of Harold Wiesenthal and Milton Goldstein. These appraisals supposedly formed the basis for the assertions contained in the promotional materials sent to the prospective partners. However, the appraisal signed by Milton Goldstein was dated October 22, 1974, almost two weeks after the initial memorandum, dated October 10, 1974, had been circulated. The other letter, signed by Harold Wiesenthal was dated even later, on November 6, 1974, by which time the partnership subscriptions had been taken for all except one of petitioners. [17]
In 1974, Milton Goldstein was president of Boasberg/Goldstein, Inc., a consultant firm for companies involved in the production and distribution of motion pictures. Prior to this, Goldstein had been the president of Cinema Center Films, a subsidiary of CBS, the major national network, and had then been with Metromedia Producers Corporation *60 as vice president for theatrical world wide sales. Goldstein's expert reputation was acknowledged by William A. Madden, respondent's expert witness. Taking into consideration a wide range of factors including the quality of the film and the distribution contracts secured by Copperidge, Goldstein estimated that the film would generate revenue in an amount exceeding $ 3,500,000 during the first 18 months of distribution. In a brief letter Harold Wiesenthal echoed Goldstein's opinion, estimating gross worldwide income in excess of $ 3,500,000. [18]
The two appraisals were introduced for the limited purpose of establishing that the limited partners had seen them. Petitioners introduced no expert testimony directly on the issue of the fair market value of the film at the time of purchase. Respondent introduced alternative expert appraisals. Robert M. Newgard (Newgard) worked as a consultant with respect to entertainment *61 programs for domestic and international clients. Since 1980 he had worked as an appraiser for respondent, frequently testifying to the valuation of motion pictures. His experience prior to 1980 was with domestic television programming, as both a distributor and a programmer. In his report based on an October 15, 1985 screening, Newgard summarized the story line and described the action in the film. He decided that "Prisoner in the Middle" was "a very confusing story" and that it was hard for the viewer to "identify with the Israeli men and women" although there was "some good action." He found that the acting and script were "just fair" and determined that the film would only be good for syndication or late night programming. He estimated projected revenues in the amounts of $ 400,000 from worldwide syndication, $ 40,000 from late night network, and $ 60,000 from pay television and cable. After taking distribution expenses into account, Newgard concluded that "Prisoner in the Middle" would have a fair market value of $ 200,000. However, Newgard noted, if the owners had believed Hamilton's promise of 500 play dates they might have expected that the film would be successful. *62 William A. Madden (Madden) was an instructor in television marketing at the University of California at Los Angeles, as well as a market appraiser for respondent [19] at the time he submitted his report evalluating "Prisoner in the Middle." Prior to this, Madden had been corporate vice president and general sales manager for Metro-Goldwyn-Meyer (MGM) [20] and then senior vice president for world sales for Doty-Dayton Company. In his report, dated September 18, 1985, Madden described the screenplay as being "contrived and full of cliches" and that "it fails to hold your interest." Because the supporting cast and director were virtually unknown and the acting was "substandard," Madden stated that "Prisoner in the Middle" would be a difficult film to distribute domestically to television programmers. He further determined that the film had no domestic theatrical value. Indeed, Madden testified that the likelihood of "Prisoner in the Middle" generating revenue in the amount of $ 2,000,000 or $ 3,000,000 was "a thousand to one shot." *63 Madden described the distribution process commonly used by the major television and theatrical distributors (the majors). [21] The average cost of distributing a film during the 1970's was approximately $ 3,000,000 or $ 4,000,000, while the cost of opening the film's theatrical release in New York City would range between $ 150,000 and $ 200,000. [22] Madden noted that success for a television motion picture was dependent on theatrical success. The distributor should release the film in a location of appropriate size and demographic composition. For "Prisoner in the Middle" the initial release ought to have been in a smaller mid-Western city where costs were lower and competition less stringent, according to Madden. In the 1970's, the ratio of successful to unsuccesful movies in the 1970's was 1 in 5 while the success ratio for movies produced by independent producers and distributed by independent distributors was only 1 in 8. *64 OPINION The first issue for decision is whether respondent properly disallowed petitioners' deductions of their respective distributive share of their partnership losses. These losses were comprised of investment tax credits as well as deductions for depreciation and amortization, for interest payments and for miscellaneous expenses. Resolution of this issue depends on whether petitioners entered into the activity with the actual and honest objective of making a profit. In order to take a depreciation deduction with respect to an asset, the asset must be used in a trade or business or held for the production of income within the meaning of section 167(a). Similarly, the investment tax credit may be taken only with respect to depreciable property. Sec. 48(a)(1). Because there is little evidence in the record to indicate that petitioners' activity with respect to the film constituted a trade or business, the inquiry is whether petitioners' activity with respect to the film was investment activity. Higgins v. Commissioner,312 U.S. 212 (1941). In order to establish *65 investment activity, petitioners must prove that the film was held for the production of income. Beck v. Commissioner,85 T.C. 557 (1985). Whether Copperidge engaged in its activities for profit depends on whether the activity was undertaken with an "actual and honest objective" of making a profit. Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dreicer v. Commissioner,78 T.C. 642, 646 1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The expectation of profit need not have been a reasonable one but the taxpayer must have entered into the activity or continued the activity with the objective of making a profit. Golanty v. Commissioner,72 T.C. 411 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). Transactions which serve no "purpose, substance, or utility apart from their anticipated tax consequences" are disregarded for tax purposes. Knetsch v. United States,364 U.S. 361 (1960); *66 Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). The issue of profit objective must be resolved at the partnership level. Brannen v. Commissioner,722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982). When petitioners are the limited partners, as they are in this case, the primary focus is on the actions of the general partners. Finoli v. Commissioner,86 T.C. 697 (1986). The determination of whether a profit objective exists is to be resolved on the basis of all the attenuating facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Golanty v. Commissioner, supra at 426. Although section 183 is actually an allowance provision, not a disallowance provision, respondent's regulations promulgated under that section have historically been employed to determine the existence of a profit motive. Respondent's regulations set forth *67 9 relevant factors. Sec. 1.183-2(b), Income Tax Regs.[23] No one factor is controlling. Golanty v. Commissioner, supra at 425-426. In this analysis, greater weight is accorded to proven objective facts than to mere statements of intent. Beck v. Commissioner, supra at 570; Siegel v. Commissioner,78 T.C. 659, 699 (1982). Respondent disallowed the losses on the grounds that the partnership was neither organized nor operated with the intention of making a profit. Respondent also argues that *68 the interest deductions petitioners took with respect to the promissory note were improper because the note did not evidence genuine indebtedness.[24] Petitioners maintain that the primary goal of the partnership was to produce a profit for the partners and that all deductions and credits were properly taken. Petitioners bear the burden of proving they had a profit motive. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a).
For the reasons discussed below, and based on our consideration of all the facts and circumstances, we conclude that both the general and the limited partners in Copperidge lacked the requisite profit motive. Therefore, petitioners are not entitled to investment tax credits with respect to the film activity. Deductions for depreciation, amortization and miscellaneous expense attributable to such activity are allowable only to the limited extent permitted in section 183(b). [25]
*69 At trial Noe testified concerning his intention to make a profit from the exploitation of the film. However, we found his testimony to be too pat and smooth, making it appear rehearsed. Conlin, who was no longer a general partner in Copperidge at the time of the trial, failed to appear, leaving much of Noe's testimony uncorroborated. Several of the documents introduced to support Noe's statements were dated after the time when the events were supposed to have occurred. We conclude that much of Noe's testimony was self-serving, untrue and not worthy of our consideration. General Partners' Inexperience
Noe's claim of profit motive is undermined by the general partners' inexperience in the entertainment business. Although he hinted that his roots were in show business, his actual experience was exclusively limited to financial and investment planning matters. [26] Noe knew nothing about the production or distribution of films. Although Conlin worked for a British film company, there was no evidence that he worked in either the production or distribution fields or that his work in any way qualified him to commercially exploit a film. Finally, Flamm, who provided the link to *70 the limited partners, had no knowledge or expertise in the entertainment industry. With so little experience and knowledge among them, the general partners should have consulted an independent and disinterested expert before making an investment in an industry where 1 out of 5 projects succeed. However, the only person whom they consulted was Blake who was then negotiating with them at that time for the rights to the film's television release. Blake was hardly disinterested. Moreover, the general partners essentially ignored Blake's advice. Blake told them that the film's television success would depend heavily on a prosperous theatrical release. Worldwide's method of distribution effectively precluded the possibility of theatrical success, ruining the chances for television. Thus, the consultation with Blake was "mere window dressing to conceal tax motives." Estate of Baron v. Commissioner,83 T.C. 542, 555 (1984), affd. 798 F.2d 65 (2d Cir. 1986). *71 The Purchase Contract
The origins of the transaction often reveal the true intentions such as the case where the promoter is shopping around for new investment opportunities. Estate of Baron v. Commissioner, supra. Such a situation occurred in the instant case. Asset Development, Noe's corporation, was in the business of developing investments. While looking around for new opportunities, Noe and Conlin learned about "Prisoner in the Middle" from Noe's attorney. There was no evidence that Noe and Conlin treated the film any differently from other investment projects packaged by Asset Development. There was no evidence that Noe and Conlin had either the intention or the ability to commercially exploit a film. The partnership interests were offered exclusively through Flamm to his clients. The bulk of the memorandum concerned tax benefits. The memorandum echoed suggestions made to Noe and Conlin in a letter sent by their attorneys which set out the criteria for tax advantaged treatment. Each suggestion became a axiomatic fact in the memorandum. The similarities in language and meaning between the tax opinion from Noe's attorneys and the subsequent memorandum *72 demonstrates that the entire transaction was arranged around the central concern of securing tax advantaged treatment for high income investors. The memorandum's unsupported allegations of profitability coupled with the stated unlikelihood of economic success indicates that profit was not among Copperidge's goals. The Distribution of the Film
The distribution contract with Worldwide reflected the chimerical nature of the transaction. The general partners did not independently investigate Worldwide but instead, blithely followed Torzeski's recommendation for a theatrical distribution company. The contract promises were extravagant and did not manifest the true understanding between the parties. Hamilton promised 500 play dates in major cities of which 50 would occur within the first month. This would be improbable, even for a high quality film, and a knowledgeable distributor like Hamilton should have known this. Furthermore, Hamilton promised to provide a New York City "send-off" for $ 100,000, approximately half of the actual cost. Indeed, these extravagant and unrealistic promises make it clear that the true purpose of the distribution contract was to bolster a paper *73 facade purporting to establish a profit orientation. The rosy picture Worldvision painted was enough to prompt a profit oriented investor to seek another opinion. During the film's theatrical distribution, the general partners appeared almost nonchalant about its failure. Upon learning that the film was being released in drive-in theatres, a profit oriented investor would at least protest. Noe and Conlin just waited for the situation to improve. A profit oriented investor would not have languished while Hamilton kept up a steady stream of excuses and explanations. Hamilton had breached the terms of his promised performance and the general partners did little in response. The contract had called for reports from World Wide on a regular basis and yet Noe and Conlin exhibited little concern when those reports were not forthcoming. The general partners did very little to mitigate the damage caused by World Wide's miserable performance. Indeed, the general partners' attempts to police the contract and enforce the terms could best be described as perfunctory. Fair Market Value
The strongest evidence of the nature of Copperidge's purchase and distribution of the film was *74 the considerable discrepancy between the purported sales price and the actual fair market value at the time of sale. Petitioners failed to introduce any direct evidence of the value of the film. There was evidence that the limited partners were assured in a letter written by alleged experts that the film would gross between $ 2,500,000 and $ 3,500,000, but these letters were not admitted for the truth of their contents. Even if they had been offered to show the actual value of the film they would be weak evidence at best. Neither of them contained a breakdown of the income forecast or any substantiation. In fact, both letters contained little more than bald statements of value. Furthermore, the film was purchased before the dates printed on one of the two letters of valuation. Respondent's expert witnesses testified fully and convincingly about the value of the film. Both Madden and Newgard estimated that the film would produce no more than $ 200,000 from all of the potential channels of distribution combined. Their valuations were supported by complete explanations of the limitations of the film and the difficulties of the market. A profit oriented investor would have insisted *75 on a detailed valuation report such as these before making a large investment. However, Copperidge purported to pay more than 5 times this amount without a detailed valuation report. An overpayment by 600 percent indicates more than the usual business optimism -- it indicates tax avoidance. As we noted in Brannen v. Commissioner, supra at 508, an inflated purchase price makes it very unlikely that there will be profit. On brief, petitioners argued that the purchase price represented the actual fair market value because it was the fruit of arduous and fierce negotiations between opposing parties. While there was no evidence of collusion between the general partners and Torzeski, there was also no corroboration of Noe's testimony. We have only his self-serving description of the negotiations as evidence that they were bitter. Petitioners' argument is misplaced in pointing to the discrepancy between the alleged asking price of $ 4,000,000 or $ 5,000,000 and the alleged final price of a little over $ 1,000,000. The truly important difference is between the alleged asking price of $ 1,125,000 and the actual fair market value at the time of purchase of $ 200,000. Furthermore, *76 there was evidence that the production costs of the film were just above $ 1,000,000. Thus, it is likely that Torzeski did try to obtain a purchase price in excess of a million dollars. However, we cannot believe that such sophisticated and worldly businessmen could have ever contemplated making an investment of over a $ 1,000,000 with such scanty background information and so little preparation. At the time of these negotiations there had been no appraisal of the film's value. Finally, the role of Torzeski's attorney, who apparently breached attorney-client confidence, was suspicious and a businessman of Noe's sophistication would have mistrusted advice from such a source. Rather, we conclude that the bitter negotiations, if they in fact occurred, focused on how great a loss the film would accrue. Paying the demanded purchase price was never contemplated. Further evidence of the absence of a profit motive is the illusory nature of the promissory note. The note purported to assume the balance of a purchase price of $ 1,250,000, which left an amount owing of $ 1,155,000 after the payment of the initial $ 95,000. Another $ 100,000 was to be paid out of the proceeds which had *77 been guaranteed by the distribution contract. Where the money purchase indebtedness grossly exceeds the fair market value of the purchased asset, there is no true indebtedness. Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T. C. 752 (1975). This is particularly true where the liability is nonrecourse and the sole source for repayment is the film's income stream from distribution proceeds. The likelihood of repayment is considered particularly weak where success is dependent upon public acceptance. [27]Estate of Baron v. Commissioner, supra.
Because the Copperidge partners never intended to repay this "loan" there was never a bona fide indebtedness. In essence, the total guaranteed payment for the film was the down payment of $ 95,000 and with the $ 50,000 payment due from Worldvision. The alleged interest payments represented *78 merely a share in the proceeds if the film were to produce any. The receipt of the balance of the purchase price was thus completely contingent. Particularly where the only income generating asset is a wasting asset we have consistently held that a debt whose repayment is limited to speculative and possibly nonexistent proceeds is not an indebtedness. Siegel v. Commissioner,78 T.C. 659, 690 (1982). Because this issue can be resolved under section 183 we will not consider respondent's other arguments which were presented on brief. The second issue for our consideration is whether the limited partners may deduct from their Federal income tax those portions of the partnership's losses which represent interest payments on the nonrecourse note. The use of nonrecourse financing is not in itself dispositive on this issue. Knetsch v. United States,364 U.S. 361 (1960). However, we look to the substance and not to the form alone with such a debt. Waddell v. Commissioner,86 T.C. 848 (1986). where the note's sole source of repayment is the *79 asset securing it and that asset is of little or no ascertainable value, it is uncertain whether the note will be paid and the note is treated as a contingent liability. Estate of Baron v. Commissioner, supra.
We have previously established that the face value amount of the note made payable to America on the Move was not likely to be repaid by Copperidge. Rather, America on the Move retained a right to contingent participation in the net receipts from the film's distribution. The true purchase price, as established above, was $ 245,000 and America on the Move had no guarantee of any additional payment. Therefore, the nonrecourse debt of Copperidge lacked economic substance. Tolwinsky v. Commissioner,86 T.C. 1009 (1986); Siegel v. Commissioner, supra;Brannen v. Commissioner, supra.Without a bona fide indebtedness there can be no deductions for the payment of interest. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 96 (4th Cir. 1985), revg. in part 81 T.C. 184 (1983). The deductions for interest which contributed to the losses passes through from Copperidge to its *80 limited partners, petitioners, are disallowed. The third and final issue for our consideration is whether petitioners are liable for the additional interest on substantial underpayments of tax attributable to tax motivated transactions pursuant to section 6621(c). [28] Respondent requested the addition to tax by amendment to answer and thus has the burden of proof. Zirker v. Commissioner,87 T.C. 970 (1986); Parker v. Commissioner,86 T.C. 547 (1986); Rule 142(a). Section 6621(c) applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date on which section 6621(c) was enacted. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to a substantial underpayment *81 attributable to a tax motivated transaction. A substantial underpayment is defined as an underpayment in excess of $ 1,000. Section 6621(c)(3)(A) enumerates the types of transactions which are to be considered tax motivated transactions. These include "(i) any valuation overstatement (within the meaning of section [Text Deleted by Court Emendation] 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle * * *, (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in substantial distortion of income for any period, and (v) any sham or fraudulent transaction." Sec. 6621(c)(3)(A). Under regulations issued by respondent pursuant to the express authority of section 6621(c)(3)(B), the definition of tax motivated transaction also includes any deductions disallowed for any period under section 183. Sec. 301.6621-2T, Q and A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). We held above that Copperidge's activity with respect to the film "Prisoner in the Middle" was arranged to generate tax benefits and was not *82 entered into for profit. Section 6621(c) also applies to underpayments attributable to the investment credit resulting from petitioners' claim of basis in excess of fair market value, which is a valuation overstatement within the meaning of section 6659(c) and therefore a tax motivated transaction within section 6621(c). Therefore, all the deductions and credits claimed by petitioners with respect to the partnership's activity were attributable to a tax motivated transaction. See Patin v. Commissioner,88 T.C. 1086, 1127-1129 (1987). In sum, after considering all the evidence presented in this case, we conclude that petitioners have failed to meet their burden of providing that their investments in Copperidge were entered into for profit. We hold that petitioners' deductions for depreciation, amortization, business expenses and interest, and petitioners' investment tax credits taken with respect to their interest in Copperidge were improperly taken. Furthermore, we have determined that any substantial underpayments in tax which result from this disallowance were attributable to a tax motivated transaction and are thus properly subject to the additional interest *83 section 6621(c). Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Syndication is the sale to an individual television station of the right to broadcast a film a specified number of times for a certain period of time. ↩
3. Late night movies were aired after 11:00 p.m. by CBS, the major broadcasting network. No other broadcasting network ran late night movies every weekday night. ↩
4. A film aired on a major network during prime time could produce revenue in am amount ranging from $ 750,000 to as much as $ 1,500,000, although Blake believed that $ 800,000 would have been a fair price. ↩
5. The distribution schedule was as follows: ↩
Distribution Market
Percentage for Fee
U.S. Network Television
15%
U.S. Non-Network Television
35%
Foreign Television
40%
Foreign Theatrical
25%
All Other Sales
40%
6. By the time that Noe and Conlin became interested in purchasing the film, Nicholas Torzeski, the film's producer, had already made tentative arrangements with Chuck Hamilton of World Wide to distribute the film. Torzeski passed Hamilton's name on to Noe and Conlin. ↩
7. In April 1982, in response to Noe's request, Torzeski's attorney sent a retyped breakdown of the film's production costs. Many of the underlying records were unavailable by that date. The total production costs were shown as $ 1,068,660. ↩
8. Worldvision did in fact pay Copperidge $ 50,000 on January 9, 1975, and, a few days later, Copperidge in turn paid America on the Move. ↩
9. The arrangement with World Wide stated that Torzeski's portion was to be sent to him directly while the remaining 20 percent was to be sent to Copperidge. ↩
10. Other subscription payments were made in the following amounts for limited partners who are not parties before us here: ↩
Name
Date
Amount
Stanley H. Kunsberg
Oct. 22, 1974
$ 27,930.00
Robert M. and Eileen
Prince Pollock
Oct. 19, 1974
27,930.00
Kooper Products, Inc.
Oct. 23, 1974
27,930.00 (note)
27,930.00 (check)
Robert R. Flamm
Oct. 22, 1974
13,965.00
Girard Franklin
Oct. 25, 1974
6,982.50 (note)
6,982.50 (check)
Elinor P. DeWitt
Nov. 5, 1974
13,965.00
11. At this later date four other limited partners subscribed who are not petitioners before us today. They are: Ira H. Kaufman for $ 13,965, Stanley Schecter for $ 13,965, Standord E. Parris for $ 27,930 and Alfred Berman for $ 13,965. ↩
12. The date of February 9 was probably incorrectly transcribed and was actually December 29. Otherwise there would be no alternative explanation for the film's apparent popularity in Bennetsville, South Carolina. ↩
13. The $ 16 figure represents the payment in the amount of $ 15.01 paid to Copperidge by World Wide. The figure of $ 6,335 represents receipts paid to Copperidge by Worldvision. ↩
14. The $ 50,371.23 interest payment for the taxable year 1975 was comprised primarily of the advance of $ 50,000 received by Copperidge from Worldvision in late 1974 and paid to America on the Move as the first alleged interest payment on the promissory note. The remaining $ 371.23 was unexplained in the partnership's books. There were apparently no subsequent interest payments on the note. ↩
15. Depreciation was figured using the income forecast method. Respondent argued that this was incorrectly computed and indeed some evidence was raised which cast doubt on petitioners' computations. However, since this issue can be resolved on other grounds there will be no discussion of the depreciation methods used herein. ↩
16. The deduction in the amount of $ 602 consisted of insurance payments in the amount of $ 600 and bank charges in the amount of $ 2. The $ 5 deductions taken in both 1977 and 1978 represent bank charges for those years. ↩
17. Respondent raised some evidence at trial that implied that the appraisal letters had been back dated but the amount of evidence introduced was not sufficient for a determination that the letters had indeed been written after the date marked upon them. ↩
18. In his letter dated November 6, 1974, Wiesenthal stated that he believed that the film had been nominated for an Academy Award. There was not even a scintilla of other evidence to support this statement and Wisenthal's reasons for making it are unknown. ↩
19. Madden estimated that as much as a quarter of his annual income came from testifying on respondent's behalf. ↩
20. During Madden's tenure at MGM the film "Prisoner in the Middle" was submitted to MGM for distribution by Torzeski and America on the Move. Although Madden did not personally review the film, it was rejected by his office at that time as being unsuitable for distribution by MGM. Presumably Torzeski then sought other arrangements. ↩
21. Although the two distribution companies employed by Copperidge were not majors, Madden said that the general scheme would be the same. Distribution contracts were either gross contracts or net contracts. Under a gross contract the distributor took 30 percent of the revenue and the owner, who also covered distribution and advertising expenses, took 70 percent. Under the net deal, the distributor paid the expenses out of gross revenue. The remainder would be divided so that the distributor receives 35 percent and the owner received 65 percent. A cooperative advertising campaign was frequently adopted and both parties would generally share that expense. ↩
22. The distribution contract between World Wide and Copperidge called for an opening in New York City at an expected cost of $ 100,000. Madden, discussing this feature of the distribution arrangement, stated that $ 100,000 would be insufficient. ↩
23. These factors are: (1) the manner in which the taxpayer carries on an activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. ↩
24. Respondent also put forward alternative arguments which we do not need to consider because we can decide the issue under respondent's primary arguments. ↩
25. Section 183(b) provides in pertinent part: In the case of an activity not engaged in for profit * * * there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). ↩
26. At trial, Noe insinuated that he had grown up in the show business world because his mother worked at Paramount Studios. However, it appears that she had left this job by the time that Noe was born. ↩
27. Indeed, there was evidence that one of the factors contributing to the failure of "Prisoner in the Middle" was an anti-war sentiment prevalent at the end of the Vietnam War. ↩
28. Section 6621(d) was renumbered as section 6621(c) in the Tax Reform Act of 1986 and will be referred to as section 6621 (c)↩ herein.