ROBERT T. MACK and BETTY J. MACK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mack v. Commissioner
Docket No. 14543-84.
United States Tax Court
T.C. Memo 1988-187; 1988 Tax Ct. Memo LEXIS 214; 55 T.C.M. (CCH) 735; T.C.M. (RIA) 88187; May 2, 1988; As amended May 17, 1988 [Text Deleted by Court Emendation] Lyndon J. Parker, for the petitioners. Carmen M. Baerga, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By a notice of deficiency dated February 21, 1984, respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1980 and 1981 in the amounts of $ 21,130.78 and $ 24,848.79, respectively. The issues for decision are (1) whether petitioners were properly entitled to take deductions for research and development expenses and miscellaneous *216 expenses resulting from their distributive share of loss taken with respect to their investment in Westec Medical Company, a limited partnership formed to develop and distribute an electronic device known as "DietMate," and (2) whether petitioners are liable for additional interest under section 6621(c). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners Robert T. and Betty J. Mack (petitioners) resided in Las Vegas, Nevada, at the time of filing their joint petition. Petitioners used the cash basis method of accounting. Betty J. Mack is a petitioner solely by filing a joint return with her husband, Robert T. Mack. All references to petitioner, *217 singularly, will be to Robert T. Mack. During the years in issue, petitioner was a building stationary engineer employed at various hotels in the Las Vegas area, although petitioner was retired by the time of trial. Petitioner explained that a building stationary engineer was responsible for the smooth operation of all the mechanical systems in the building. Because many of the controls for the building's various mechanical systems were electronic, petitioner acquired some familiarity with electronic devices. Westec Medical Company (sometimes referred to as the partnership or as Westec) was a limited partnership formed in the Virgin Islands which was organized to develop, manufacture and distribute an electronic weight control device known as "DietMate." Petitioner first learned of Westec in a presentation which had been arranged by Daniel Miller (Miller), petitioner's accountant. Miller had been petitioner's accountant and tax advisor for 23 years. [2]
Stanley Drizen (Drizen), the promoter *218 of Westec, made the presentation to solicit investment in Westec. Edward Simms (Simms), was Westec's sole general partner. Miller believed that Simms was employed as Drizen's bookkeeper. Petitioner estimated that approximately a third of the half hour presentation concerned the tax consequences of the investment. The presentation did not include income projections. Although petitioner did not conduct any independent research into the proposed venture presentation, based on the presentation and on his own knowledge, he decided that Westec would be commercially successful. Westec was the creation of Mori Aaron Schweitzer (Schweitzer), an attorney, licensed to practice law in the State of New York but who resided in the Virgin Islands. In 1978, Schweitzer had organized a corporation under the laws of the State of Oregon called Biometrics Inc. (Biometrics) to manufacture and market high technology electronic devices. Schweitzer was a major shareholder, general counsel and the chairman of the board of directors of Biometrics. Biometric's sole product was an electronic "exercise computer" called Genesis (hereafter referred to as the watch) which could be worn on the wrist and which *219 enabled the wearer to monitor his pulse rate while he exercised. Biometrics manufactured the watch at its plant in Plymouth, Minnesota. Despite steadily increasing sales, Biometrics was consistently plagued by financial difficulties. In late 1979, Biometrics was able to raise $ 1.5 million dollars by means of a public stock offering, but nevertheless it remained a financially weak venture. Some time during 1980, Schweitzer was approached by an inventor who was interested in having Biometrics develop and distribute his invention, DietMate. [3] DietMate was designed to be a pocket-calculator sized electronic device which would monitor an individual's daily caloric consumption and expenditure. The individual would initially program the device with certain physical data including his height and weight. Throughout the day the individual would enter into the device the number of calories he consumed. An attachment (the monitoring device would then measure the individual's physical motion and subtract an appropriate number of calories pursuant to certain mathematical formulae. By keeping a record of the individual's caloric consumption and expenditure, the device allowed him to more *220 accurately gauge weight loss or gain. Because of its financial difficulties, Biometrics would have been unable to obtain the financing necessary to fund the initial research and development required to market DietMate. Biometrics could not develop and manufacture Dietmate itself. However, Schweitzer wanted to take advantage of the unique opportunity and potential profits he foresaw in the development and commercial exploitation of DietMate. Therefore, Schweitzer organized and promoted Westec in conjunction with Drizen to perform those functions in a joint venture with Biometrics. At some time during or subsequent to the presentation by Drizen, petitioner was given the partnership's promotional materials. Westec distributed a "Confidential Memorandum" (the Memorandum) dated July 7, 1980. According to the plan in the Memorandum, Westec would acquire the license to develop DietMate from Unimed, Ltd., a Hong Kong company and would arrange to have DietMate developed by a research company in Hong Kong. If the product were successfully developed it would be manufactured by Biometrics who would also market *221 and distribute it. The purchase price was $ 100,000 per partnership unit and a total of 45 investors were sought. The purchase price was to be paid according to a schedule of cash payments and promissory notes. A payment in the amount of $ 12,500 was to be made in cash by the end of 1980. Another payment in the amount of $ 12,500 was payable in 1981 in monthly installments. The remainder of the purchase price was payable through long-term conditionally recourse promissory notes. There were two different promissory notes, each bearing an interest rate of 12 percent and payable only if research and development had been completed to the satisfaction of the general partner. The first note in the principal amount of $ 37,500 will become due on December 31, 1988. The final note, in the amount of $ 37,500, will be due on December 31, 1997. The terms of the promissory notes indicated that the source of repayment prior to the date of maturity was 50 percent of the proceeds from the distribution of the product or all of the proceeds from the sale of the partnership interest. Under the terms of the second note, the note maker was not personally liable for the repayment of interest *222 but only for the collateral. Schweitzer intended to use these notes as the collateral for loans from a financial institution in Switzerland, Atlantis S.A. Geneve. The proceeds from the loans were needed to finance the research and development of DietMate. There was no evidence that funding was actually secured from Atlantis S.A. Geneve or any other credit institution. In bold capital letters, the Memorandum warned potential limited partners of the speculative nature of the investment. In fact, the Memorandum stated, the investment would only be appropriate for individuals in "the highest Federal personal service income tax bracket" with a personal net worth in excess of $ 250,000. [4] The Memorandum gave no assurance that DietMate could be developed or, if it were developed, that it could be marketed. The Memorandum warned that the research and development company which had been selected to develop DietMate had no obligation to actually perform any research and development activity. If development proved to be infeasible, the entire investment contribution would be lost. Furthermore, if the development efforts were successful but DietMate could not be profitably marketed, *223 the capital contribution could be lost but the balance of the promissory notes would still be due. The Memorandum further advised prospective investors that the arrangements which had been planned would create certain conflicts of interests, primarily due to Schweitzer's roles in Westec and in Biometrics. Finally, the memorandum indicated that DietMate had not been patented and that no patent protection would be obtained. The Memorandum contained a report by Lansdowne Marketing, Inc., a wholly-owned subsidiary of J. Walter Thompson Company, Ltd. of London (the report) which stated that due to the weight-conscious mood in the United States and in Europe, DietMate would have widespread appeal. The report indicated that DietMate would garner 60 percent to 70 percent of the total market. The report estimated potential sales in the United States of between 600,000 and 900,000 during the first two years of distribution, eventually reaching total *224 sales in an amount ranging between 1.2 and 1.8 million. A considerable portion of the Memorandum concerned the tax consequences of an investment in Westec. On September 6, 1980, petitioner purchased one unit of Westec making a cash payment of $ 12,500. Petitioner executed two long-term promissory notes, one payable in 1988 and one payable in 1997, as directed by the Memorandum. The terms of the notes provided that the source of repayment prior to maturity would be proceeds of distribution. During 1981 petitioner made nine payments in the amount of $ 1,114.52 and one payment in the amount of $ 1,944.00 resulting in a total payment in the amount of $ 11,974.68. Westec was organized under the laws of the Virgin Islands. The Certificate of Limited Partnership (the Certificate), dated October 31, 1980, stated that the partnership had been formed on July 7, 1980 and had been organized to "acquire the rights to an undeveloped, pocket-sized electronic calorie computer, complete the research for and development of the device and market it." Westec maintained its principal bank account in Las Vegas, Nevada, until December 3, 1981. Westec's signature card held by the bank listed "tax *225 shelter" as Westec's business. The Certificate listed Westec's principal place of business as 345 Bakery Square Building, St. Thomas, U.S.V.I., but this address was only a mail drop. Westec had no office. Schweitzer explained that the reason Westec was organized in the Virgin Islands was to take advantage of governmental subsidies available to companies which manufactured products in the Virgin Islands. However, Westec did not plan to conduct manufacturing activity in the Virgin Islands and thus could not benefit from the subsidies. None of Westec's books and records were introduced into evidence at trial. Westec was one of twelve limited partnerships organized and operated by Schweitzer. In addition to Westec, five other limited partnerships, were formed in 1980. These were "Alert-Mate Associates," "Auto-Mate Associates," "Lanad Associates," "Posta-Scale Associates" and "Pressure Mate Associates." In 1981, Schweitzer formed "Aqueous-Alert Associates," "Chef-Mate Associates," "Diet-Scale Associate," "Fuel Guard Associate," "Fuel Sense Associates" and "Sesame Associates." All of these limited partnerships had the Virgin Islands as their principal place of business. Each *226 of them was organized to develop, manufacture and exploit a single electronic device. [5] None of these ventures realized income. Each of the Certificates of Limited Partnership was written in identical language. Only the particular product to be developed and exploited differed for each Certificate. Each of the ownerships engaged a research and development company from Hong Kong. Several of the partnerships were engaged in joint ventures with BioMetrics similar to the arrangement between Westec and BioMetrics. Each Certificate listed the same address, 345 Bakery Square Building, St. Thomas, U.S.V.I. *227 Westec's sole general partner was Simms, Drizen's bookkeeper. The Certificate listed 26 limited partners, including petitioner and Drizen, the promoter. The stated contributions to Westec from the limited partners ranged in amount from $ 100,000 to $ 700,000 and the partners' interests varied from two percent to fourteen percent. Simms contributed $ 5,000 and received a ten percent interest. Schweitzer was not a limited partner but was employed by the partnership as general counsel. Schweitzer conducted all of Westec's affairs. There was no evidence that Simms participated in any way in the day-to-day activities of the partnership. Schweitzer was to receive exclusive distribution rights to DietMate for part of the geographical area other than that area to which Westec held license. Westec had purchased licenses to distribute DietMate in California, Oregon, Washington, Alaska, and Hawaii. [6]
*228 Westec arranged for the DietMate to be developed for production by a Hong Kong research firm. The firm was identified as the International Medical Research and Development, Ltd. (IMRD). Although IMRD promised to use its best efforts to complete the research and development by December 31, 1980, it declined to guarantee the success of its efforts by that date. The report which was allegedly produced by IMRD and which described the developmental process of DietMate was not entered into evidence because it was determined to be inadmissible hearsay. Schweitzer indicated that IMRD was chosen to develop DietMate because the new micro-chip technology required for the production of DietMate was less expensive in Hong Kong and Japan than in the United States. According to Schweitzer, IMRD produced a prototype model to test the design and function of the device. The prototype was connected, for the sole purpose of testing, to a larger computer, known as an emulator. The emulator was a substitute for the tiny but costly micro-chip which would eventually operate the device. According to Schweitzer, DietMate worked perfectly when it was connected to the emulator. The results of the tests *229 and the prototype itself were not introduced into evidence. [7] The micro-chip had not been produced by the time of trial. Under the agreement between Westec and IMRD, Westec was to make payments to IMRD in the amounts of $ 2,250,000 and $ 1,687,500 by December 31, 1980 and December 31, 1981 respectively. There were conditions to be met, however, before full payment was due. IMRD had to complete a production and marketing budget and produce a prototype of the device. After IMRD had accomplished these tasks, Westec wasto notify IMRD to complete the development process by December 31, 1980. If any of these conditions were not fulfilled, the agreement would terminate. There was no documentary or photographic evidence to suggest that a prototype had ever been created. Nonetheless, the full amounts owed for taxable years 1980 and 1981 were listed on Westec's respective Federal income tax returns as expenditures *230 for research and development. Meanwhile, Biometrics' financial woes had increased. A part of the internal mechanism which was necessary for the manufacture of the watches became unavailable and in 1981, Biometrics filed for bankruptcy. [8] In 1982 Biometrics' primary creditor seized all of the assets. All of Biometrics' books and records were seized and were thus unavailable for trial. Suddenly without a distributor, [9] Westec sold the rights to DietMate to Jobe Medcare (Jobe), a company which operates Health Maintenance Organizations and furnishes medical delivery services in Florida and Pennsylvania. The limited partners were to be compensated with stock from Jobe but at the time of trial petitioner had not received any stock. *231 Westec has not been financially successful. For the taxable years 1980, 1981 and 1982 Westec declared losses on its Federal income tax returns in the amounts of $ 2,250,012, $ 2,203,949 and $ 20,717, respectively. Expenditures for research and development comprised the greatest part of the losses. The actual breakdown of the components of the net losses is as follows: Amount
Expense
1980
$ 2,250,000
Research & Development 12
Bank Charge  1981
1,687,500
Research & Development  31,670
Administrative  475,000
Royalty Payment  9,500
Payment to Partner  279
Accounting Fees  1982
20,150
Legal & Professional Fees  25
Bank Charges  542
Accounting Fees  For taxable year 1983 Westec declared that it was inactive. Westec has filed no Federal income tax returns since 1983. OPINION The first issue for our decision is whether respondent properly disallowed petitioner's deductions for his distributive share of the partnership losses in the taxable years 1980 and 1981. These losses were comprised of deductions for research and development and for miscellaneous business expenses. *232 Resolution of this issue depends on whether petitioner entered into the activity with the actual and honest objective of making a profit. Respondent disallowed these losses on the grounds that Westec was neither organized nor operated with the intention of making a profit. Respondent contends that Westec was just one of several tax shelters which Schweitzer organized and promoted. Respondent argues that there was never a remote possibility that Westec would produce economic profit. Rather, respondent argues, Westec was created solely for the purpose of generating tax deductions and losses to shelter the limited partners' other income. Finally, respondent contends that non of the transactions which were alleged to have transpired can be documented or substantiated and thus cannot be considered genuine. Petitioner maintains that the primary goal of the partnership wasto produce income by developing and commercially exploiting DietMate. Petitioner contends that the entire transaction was motivated by profit objective. Petitioner bears the burden of proving that the partnership had a profit motive. *233 Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). In order to deduct the expenses incurred in research and development, the taxpayer must incur the expenses in connection with a trade or business. Sec. 174.[10] However, the Supreme Court held that the meaning of the phrase "in connection with a trade or business" should not be interpreted as narrowly under section 174 as it is under section 612. Snow v. Commissioner,416 U.S. 500 (1974), revg. 482 F.2d 1029 (6th Cir. 1973), affg. 58 T.C. 585 (1972). However, for section 174 to apply the taxpayer must still be engaged in a trade or business at some time. Green v. Commissioner,83 T.C. 667, 686 (1984). In order for an activity to constitute a trade or business within the *234 meaning of section 174 the activity must have been entered into with the objective and intention of making a profit. Drobney v. Commissioner,86 T.C. 1326 (1986); Herrick v. Commissioner,85 T.C. 237 (1985); Green v. Commissioner, supra at 687. Whether Westec engaged in its activities for profit depends on whether the activities were undertaken with an "actual and honest objective" of making a profit. Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The expectation of profit need not have been a reasonable one but the taxpayer must have entered into and continued the activity with the objective of making a profit. Golanty v. Commissioner,72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). Transactions which serve no "purpose, substance or utility apart from their anticipated tax consequences" are disregarded for tax purposes. *235 Knetsch v. Commissioner,364 U.S. 361 (1960); Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). The issue of profit motive must be resolved at the partnership level. Brannen v. Commissioner,722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982). When petitioner is a limited partner, as he is in this case, the primary focus is on the actions of the general partner. Finoli v. Commissioner,86 T.C. 697 (1986); Rosenfeld v. Commissioner,82 T.C. 105, 112 (1984). The determination of whether a profit motive exists is to be resolved on the basis of all the attentuating facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Golanty v. Commissioner, supra at 426. We consider all the facets of the transaction to determine if it was carried on in a businesslike fashion. *236 Drobny v. Commissioner, supra at 1343-1346. Although section 183 is actually an allowance provision, not a disallowance provision, respondent's regulations promulgated under that section have historically been employed to facilitate the determination of the existence of a profit motive. Respondent's regulations set forth nine relevant factors. Sec. 1.183-2(b), Income Tax Regs.[11] No single factor is controlling. Golanty v. Commissioner, supra at 425-426. In this analysis greater weight is accorded to proven objective facts than to mere statements of intent. Beck v. Commissioner,85 T.C. 557, 570 (1985); Siegel v. Commissioner,78 T.C. 659, 699 (1982). *237 Inexperience on the part of the participants in a research and development venture is evidence of a lack of profit motive. Herrick v. Commissioner, supra at 256. The promoters and participants in Westec had little knowledge or experience with electronic devices such as DietMate. Petitioner had no experience with electronic products and made no independent investigation of the feasibility and marketability of DietMate. Schweitzer was an attorney and his experience with electronic devices was limited to managing Biometrics which suffered from relentless financial distress. There was no evidence that Simms, the general partner, had any knowledge of, or experience with, either the production or the marketing of devices such as DietMate. The overall plan, as proposed by Westec to its prospective limited partners in the Memorandum, was weak and painted a picture of inevitable failure. The entire plan to develop and commercially exploit DietMate depended on the joint venture with Biometrics to manufacture and distribute the finished product. However, Biometrics had deep financial troubles and was barely solvent in 1980, the first year of Westec's existence. In *238 the second year of Westec's existence, in 1981, Biometrics filed for bankruptcy. In 1982, Westec had not secured the services of either a manufacturer or a distributor and yet failed to investigate the alternatives. Because obtaining a manufacturing and distributing company was integral to the overall success of DietMate's commercial exploitation, this omission provides additional evidence of Westec's lack of profit motive. The structure of the financing further undermines petitioner's claims of Westec's profit motive. The financing was arranged so that the first two years of payments, in the aggregate amounts of $ 12,500 per year, constituted all the payment that was required. The bulk of the stated purchase price was financed through promissory notes under which the source of repayment prior to the maturity date was limited to the proceeds of distribution. Furthermore, repayment could be excused by the general partner. The terms of the promissory notes were designed to give a superficial impression that the notes were full recourse and that payment was obligatory but, in fact, ultimate payment was contingent on the decision of the general partner. The bulk of the promotional *239 materials stressed the tax consequences, while painting a very gloomy picture of the likelihood of economic success for the venture. The Memorandum repeatedly warned investors that the device might not create any profit. Such language is often indicative of a lack of profit motive. [12]
Furthermore, the Memorandum stresses the many weaknesses in the plan to develop DietMate. The general partner was inexperienced. There were inherent conflicts of interest between Westec and Biometrics. The Memorandum noted that DietMate had not been patented and would give no representation as to the extent of trade secrets protection DietMate would receive under common law. The Memorandum warned that neither Atlantis S.A. Geneve, IMRD nor Biometrics could be counted on to perform their assigned functions in the plan. The Memorandum also stated that Westec would consume all of its capital developing DietMate and would have no cash available until *240 proceeds from sale of the device were generated. Westec was more than risky; it was doomed. Petitioner's entire case rests on Schweitzer's testimony. Because there was no documentation concerning the loan from Atlantis S.A. Geneve, the purported payments to IMRD, and the sale to Jobe, we have only Schweitzer's word that all these events transpired. Howwever, we found Schweitzer's testimony to be unbelievable and not worthy of our respect. Schweitzer was unable to adequately explain why Westec was organized in the Virgin Islands. The alleged subsidies from the Virgin Islands government could not have been the true incentive because Westec never took advantage of them. Although Schweitzer said the partnership was located in the Virgin Islands because he lived there, there was no evidence that he actually spends very much time there. Schweitzer testified that funding for the research and development phase came from a Swiss bank, Atlantis S.A. Geneve. However, petitioner failed to introduce any evidence to support this. There was no record of money being transferred and no copies of correspondence to confirm the details of the arrangement. It is conceivable that millions *241 of dollars would be transferred among parties in Switzerland, Hong Kong and the Virgin Islands without producing some kind of paper record which could have been introduced at trial. Schweitzer failed to adequately document the research and development activities which were alleged to have been conducted by IMRD. There was no evidence of any payment to IMRD or any correspondence between IMRD and Westec or Schweitzer. Indeed the only evidence of IMRD's existence is a report from IMRD which was not admitted into evidence because it could not be authenticated. Even if the report had been considered there is nothing about it which indicates that it is genuine or that it accurately describes actual research activities. The entire report could have easily been produced by Schweitzer to give the illusion of research activity. Petitioner's failure to submit the prototype casts further suspicion on IMRD's role in Westec's activities. There was a photograph of the mock-up mounted on a board but the plastic casing did not contain any internal working mechanisms. The prototype which had allegedly been tested with the aid of the emulator was not brought forward. Even if the research was *242 conducted it was useless without the micro-chip which would operate the device. The micro-chip was never developed. IMRD never guaranteed that it would conduct any research and development activities with regard to DietMate. Finally, there was no evidence of payment to IMRD because Westec's books and records were not submitted. The most severe blow to Schweitzer's credibility stems from the fact that eleven other partnerships were organized in exactly the same way as Westec. Schweitzer testified that when the DietMate concept was first offered to Biometrics, he seized the chance to develop it. Because Biometrics was in financial straits at that time, Schweitzer formed Westec as a venture capital partnership to allow the development of DietMate to remain separate from Biometrics. However, it stains credulity that a once-in-a-lifetime offer like DietMate could occur eleven other times within a two-year period. The marked similarity in wording and format between the Certificates for the twelve limited partnerships makes it hard to conclude that Westec was anything other than one of a group of identical tax shelter arrangements designed to take advantage of the deduction for *243 research and development expenditures under section 174. Thus, we conclude that the various transactions into which Westec entered were motivated to obfuscate the partnership's activities and real purpose. If there was a research and development company in Hong Kong named IMRD, and there was no evidence that there was, we believe it was selected primarily to hamper respondent's investigation. Similarly, the Swiss bank was a ruse to make it difficult for respondent's agents to discover whether there was any financial activity. If petitioner or Schweitzer had any evidence to support their version of these transactions they should have presented it at trial. Their failure to do so allows us to draw the inference that the evidence would not, in fact, have supported it. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Respondent introduced into evidence the testimony of an expert witness who testified about the value of the DietMate device and the likelihood of the tentative success under the arrangements and contracts described in the promotional materials. *244 Opinion testimony of an expert is admissible if, and because, it will assist the trier of fact to understand evidence that will determine a fact in issue. See rule 702, Federal Rules of Evidence. Such evidence must be weighed in light of the demonstrated qualifications of the expert and all other relevant evidence. Estate of Christ v. Commissioner,480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955), a affg. a Memorandum Opinion of this Court. Walter L. Zweifler (Zweifler), respondent's expert witness, is Senior Financial Appraiser and Chief Operating Officer at Zweifler Financial Research. Zweifler Financial Research provides valuations of entire businesses, including evaluations of partial *245 ownership interests therein and intangible assets. He has frequently appraised intangible rights such as goodwill, copyright and patent rights. The businesses he has evaluated cover a wide range of interests and activities. After receiving a Bachelor of Science degree from the Wharton School of Finance in 1958, Zweifler worked for a number of companies including W. E. Hutton & Co., Bache & Co., Muller & Co., Piper Jaffray & Hopwood, Applied Portfolio Strategy, The Amivest Corporation and Marshall & Stevens, Inc. Zweifler is a member of the American Society of Appraisers, the ESOP Association, the International Institute of Valuers, the Financial Analysts Federation and the New York Society of Security Analysts. Zweifler has served as Adjunct Professor of Valuation Sciences at Yeshiva University and has authored many articles and reports on valuation. Zweifler's report, which was submitted into evidence, examined the terms of the Westec promotional materials to evaluate the viability of the overall plan. After considering the "weight control industry," including the market for diet devices, Zweifler determined that DietMate did not introduce new and innovative technology. *246 Indeed, the electronic and mechanical components of DietMate were so familiar in the industry that Zweifler believed that DietMate could not be patented. Zweifler explained that part of the device which was designed to monitor caloric expenditure was actually a simple pedometer that would only measure motion. Thus, two activities which required the same amount of motion but consumed different amounts of calaories would be considered to be identical by DietMate. Thus, DietMate would be protected by common law trade secret law alone and would be much more vulnerable than if protected by patent law. Zweifler emphasized that without patent protection the economic life of the device would be short and competition would be intense. Over 50,000 DietMates would have to be sold in the market territory, comprised of only four states and the Virgin Islands, [13] to recover the start up costs alone. However, Zweifler determined that DietMate did not offer features which were sufficiently unique or desirable as to make it likely that sales would be of such volume. Zweifler concluded from the promotional materials alone, that the chances of success for the Westec venture were remote and that *247 the total expenditures necessary to ready DietMate for market were unsupported by fact or reason. Petitioner did not introduce expert testimony at trial. The Memorandum, however, included a report on the market feasibility of DietMate, prepared by Lansdowne Marketing, Inc., in London, England. The report determined that there was a strong market for diet-assisting devices. Comparing DietMate favorably with do-it-yourself electronic blood pressure monitoring devices with respect to marketability, the report estimated total sales in the United States in the first two years would be between 600,000 and 900,000. There are shortcomings inherent in the report, however, which limit its viability and usefulness. The report did not address the question of patentability or competition. In contrast, *248 Zweifler mentioned that if DietMate could not be patented its competition would be considerable. Moreover, the report was based on the assumption that DietMate could accurately monitor the expenditure of calories which it was not, in fact, designed to do. The monitoring device could only measure motion. In addition, the report considered sales in the total United States whereas DietMate was only licensed for sale by Westec in certain western states. Thus, we conclude that the report was unduly optimistic about DietMates's chances of success and should not be considered. In light of Zweifler's fine credentials and qualifications and the well reasoned findings of his report, we conclude that DietMate was not worth $ 3,937,500, the stated cost of development, manufacture and marketing. DietMate would have been unpatentable and thus would have had a short economic life. Although Zweifler did not estimate a fair market value for DietMate during the years in issue here, Westec would not have been able to recoup its investment. Furthermore, we conclude that the investors in Westec were well aware of the nature of their investment. We find that Westec was organized, operated and *249 advertized as a tax shelter and that the production of profit was never among the goals of its promoters. Similarly, we conclude that there was no evidence presented that Westec did contact a Hong Kong research and development company or that any research activity was conducted or even contemplated. There was no evidence that payments were made or requested. There was no evidence that financing was obtained from a bank in Switzerland. There was no reason to believe that Biometrics would be able to fulfill its slated duties after it had filed for bankruptcy. Westec made no efforts to arrange an alternative method for bringing DietMate to market. In sort, the entire arrangement leaves us no choice but to conclude that no real businesslike activity was planned or conducted. Schweitzer and Drizen have created a veritable barrage of paperwork and correspondence to indicate genuine businesslike activity but it is nothing more than an elaborate ruse. The final issue for our consideration is whether petitioner is liable for the additional interest on substantial underpayments of tax attributable to tax motivated transactions pursuant to section 6621(c) in the taxable years 1980 and *250 1981. Respondent has requested the addition to tax by amendment to answer and thus has the burden of proof. Zirker v. Commissioner,87 T.C. 970 (1986); Parker v. Commissioner,86 T.C. 547 (1986); Rule 142(a). Section 6621(c) applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date on which section 6621(c) was enacted. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c) provides for an increase in the rate of interest payable under section 6601 with respect to a substantial underpayment attributable to a tax motivated transaction. A substantial underpayment is defined as an underpayment in excess of $ 1,000. Section 6621(c)(3)(A) enumerates the types of transactions. These include "(i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle * * *, (iv) any use of an accounting method specified by regulations prescribed by the Secretary *251 as a use which may result in substantial distortion of income for any period, and (v) any sham or fraudulent transaction." Sec. 6621(c)(3)(A). Under regulations pursuant to the express authority of section 6621(c)(3)(B) the definition of tax motivated transaction also includes any deductions disallowed for any period under section 183. Sec. 301.6621-2T, Q and A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50391 (Dec. 28, 1984). We held that Westec's activity with respect to the development and commercial exploration of DietMate was arranged to generate tax benefits and was not entered into for profit. Because we have held that the transaction was not entered into for profit there is no trade or business with respect to which the research and development expenses can be incurred. The deductions taken by petitioner for the taxable years 1980 and 1981 are thus disallowed. Based on the evidence introduced at trial, we conclude that respondent has met his burden of proving that all the deductions claimed by petitioner with respect to Westec were attributable to a tax motivated transaction. See *252 Patin v. Commissioner,88 T.C. 1086, 1127-1129 (1987). In sum, after considering all the evidence presented in this case, we conclude that petitioner's investment in Westec was not entered into for profit. We hold that petitioner's deductions for research and development taken with respect to the investment in Westec are improper. Furthermore, we have determined that any substantial underpayments in tax which result from this disallowance were attributable to a tax motivated transaction and are thus properly subject to the additional interest under section 6621(c). Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Former subsection (d) of section 6621 was redesignated as subsection (c) and amended by section 1511(c)(1)(A)-(C), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. ↩
2. Miller arranged between five and ten Westec presentations for various clients. He was paid a finder's fee of approximately $ 1,000 for each of his clients that invested in Westec. ↩
3. Schweitzer could not recall the name of the inventor of DietMate. ↩
4. In response to a question in an "Offeree Questionnaire" presented by Westec, petitioner indicated that his net worth exceeded $ 250,000 and that a portion of his gross income would be taxable at a rate of 50 percent or greater. ↩
5. These devices are as following: Alert-Mate, "automatic anti-theft device"; Auto-Mate, a device "which will automatically alert a car's owner to necessary maintenance"; Lanad, an "electronic anti-intrusion device"; Posta-Scale, an "electronic scale which will automatically weight, compute and display necessary postage"; Pressure Mate, an "automatic blood pressure monitoring device"; Aqueous-Alert, an "electronic device which measures the amount of water in petroleum storage tanks"; Chef Mate an "electronic cook book device"; Diet Scale, "an electronic device"; Fuel Guard, an "electronic locking device"; Fuel Sense, an "electronic fuel measuring device"; and Sesame Associates, a "voice activated locking device." The Certificate of Limited Partnership submitted for Posta Scale was amended because a description of DietMate was placed where the description of the Posta Scale device should have been. ↩
6. According to Schweitzer, Trans-Western Biometrics, the company created by the funding of the Canadian underwriting firm Bond Street International Securities Ltd. when Biometrics first became insolvent, was to receive the licencing rights for Canada. However, Trans-Western Biometrics became insolvent itself before DietMate could be developed. ↩
7. Schweitzer maintained that IMRD also built a "mock-up," a plastic casing which resembled the finished product but which did not have any internal components and could not function. A photograph of the mock-up was submitted into evidence, but the working prototype was not. ↩
8. This was not the end of Biometrics. A Canadian underwriting firm, Bond Street International Securities, Ltd., agreed to reorganize and underwrite Biometrics after the bankruptcy. Initially, Biometrics became Biometrics Electronics International, Ltd. with its principal place of business in Vancouver, British Columbia. Then it was reorganized as Trans-Western Biometrics, Ltd. After the initial bankruptcy Schweitzer had only a small part in the management or affairs of the company. ↩
9. Pursuant to Biometric's demise an undated, unsigned memorandum was transmitted from the general partner to all the limited partners in which Westec discussed exchanging the licensing agreement Westec had with Unimed, Ltd. for a royalty agreement giving Unimed the responsibility for manufacture and distribution. This course of action was apparently abandoned. ↩
10. Section 174 provides in pertinent part: (a) Treatment as Expenses. (1) In General -- A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction. ↩
11. These factors are (1) the manner in which the taxpayer carries on an activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income and losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned, (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. ↩
12. See Ailloni-Charas v. Commissioner,T.C.Memo. 1988-83; Gjesteby v. Commissioner,T.C. Memo. 1987-617 (on appeal, 1st Circuit, March 18, 1988); Lowenbach v. Commissioner,T.C. Memo. 1987-496↩. 13. The discrepancy between Zweifler's report and the copy of the contract executed by Biometrics and Westec on the issue of the exact contents of the licensing territory is due to the fact that the original licensing agreement was amended to include the Virgin Islands in addition to the five West Coast states. This discrepancy in no way impinges on our consideration of this case. ↩